## UNITED STATES v. STANDARD OIL CO. OF INDIANA.

### (District Court, N. D. Illinois. August 3, 1907.)

**1. CONSTITUTIONAL LAW—INTERSTATE COMMERCE LAW.**

Neither the Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154] nor the amendatory Elkins' Law Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 599], is unconstitutional on the grounds either (1) that in requiring all shippers to pay the published rates for transportation it deprives them of a natural right to make private contracts in respect thereto and therefore of their property without due process of law; nor (2) that by authorizing carriers to establish rates binding on shippers it confers upon them legislative power; nor (3) that it deprives shippers of the right to invoke the judgment of the courts as to the reasonableness or unreasonableness of rates; nor (4) that in making it a criminal act for a shipper to accept rebates Congress exceeded its power under the commerce clause of the Constitution.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, § 847, 92.]

**2. COMMERCE—INTERSTATE COMMERCE—CARRIERS SUBJECT TO REGULATION.**

A connecting railroad carrier over whose line an interstate shipment passes is engaged in interstate commerce with respect to such shipment and subject to the law regulating the same, although its line may lie wholly within one state.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Commerce, § 26.]

**3. SAME—COMMON ARRANGEMENT FOR THROUGH CARRIAGE.**

That a defendant made contracts for the through carriage of interstate shipments, and settlements therefor, solely with one railroad company, although such shipments passed over the lines of other companies also, sufficiently proves a common arrangement between the carriers for a continuous carriage.

[Ed. Note.—For cases in point, see Cent. Dig. vol 10, Commerce, § 26.]

**4. SAME—LAWFUL RATES—CONNECTING CARRIERS.**

Where a railroad company published and filed a schedule of rates between points on its line within a state, and also procured and filed as its own the schedules of rates of a terminal company for the carriage of property from one of such points into another state and made contracts for through carriage and collected the freight therefor, it was an interstate carrier as to such shipments, and the lawful rate was the sum of the rates shown by the two schedules.

**5. CARRIERS—PROSECUTION OF SHIPPER FOR OBTAINING ILLEGAL CONCESSION—EVIDENCE.**

On the trial of a shipper charged with having obtained a concession from the lawful published rate on interstate shipments in violation of the federal statute, the fact that another railroad may have had a published rate approximately as low as that received is immaterial.

**6. SAME—KNOWLEDGE OF LAWFUL RATES—PRESUMPTION.**

A shipper is chargeable with knowledge of the lawful rate on his shipment where it has been published and filed as required by law, where it is accessible to the public, unless he was misled after using proper diligence to ascertain such rate.

**7. SAME—VIOLATION OF LAW—NUMBER OF OFFENSES.**

Under the provision of the Elkins' Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 599], that "every person or corporation who shall offer, grant or give, or solicit, accept or receive any such rebates, concession or discrimination shall be deemed guilty of a misdemeanor," where a shipper has been continuously receiving concessions from the lawful rate from a railroad company, the government is not limited to a prosecution for a single offense, nor will the obtaining of a concession

155 F.—20

to remain in force for a year render all shipments made thereunder one offense nor the rendering of monthly freight bills reduce the number of offenses to the number of such bills, but each shipment made at the illegal rate constitutes a separate offense, and where the published rate is on car lots, and the reduced rate is granted on the same basis and a separate charge made for each car, in the 'absence of evidence showing to the contrary, each car constitutes a separate shipment.

8. CRIMINAL LAW—SENTENCE—EVIDENCE TO AID COURT IN EXERCISE OF DISCRETION.

Where it rests in the discretion of the court to fix the punishment for a criminal offense after conviction, the court has power to subpœna and examine witnesses or take into consideration other evidence as to matters which may be in aggravation or mitigation of the offense, although not admissible on the issue of guilt or innocence.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Criminal Law, § 977.]

For former opinion, see 148 Fed. 719.

Edwin W. Sims, U. S. Atty., and James H. Wilkerson and Harry A. Parkin, Sp. Asst. U. S. Attys.

John S. Miller, Virgil P. Kline, Alfred D. Eddy, Moritz Rosenthal, and Chauncey W. Martyn, for defendant.

LANDIS, District Judge. This is a prosecution of the Standard Oil Company of Indiana for alleged violations of the act, approved February 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 599], known as the "Elkins' Law." The charge is that the defendant's property was transported by the Chicago & Alton Railway Company at rates less than those named in the carrier's tariff schedules published and filed with the Interstate Commerce Commission, as required by law. The offenses are alleged to have been committed during the period from September 1, 1903, to March 1, 1905. The indictment contains 1,903 counts, each charging the movement of a car of oil. Certain of the transportation is alleged to have been from Whiting, Ind., to East St. Louis, Ill., the remaining counts covering transportation from Chappell, Ill., to St. Louis, Mo. The plea was "not guilty." On the trial 441 counts were withdrawn from the consideration of the jury on grounds not going to the ultimate questions involved in the case. On 1,462 counts the verdict was "guilty." Motions for a new trial and in arrest of judgment having been overruled, the matter is now before the court for the imposition of the penalty authorized by law.

The statute is as follows:

"And it shall be unlawful for any person, persons or corporation to offer, grant or give, or to solicit, accept, or receive any rebate, concession, or discrimination in respect of the transportation of any property in interstate or foreign commerce by any common carrier subject to said act to regulate commerce and the acts amendatory thereto whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier as is required by said act to regulate commerce and the acts amendatory thereto, or whereby any other advantage is given or discrimination is practiced. Every person or corporation who shall offer, grant, or give or solicit, accept or receive any such rebates, concession or discrimination shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than one thousand dollars nor more than twenty thousand dollars."

The provisions requiring the publication and filing of tariff schedules are as follows:

"Every common carrier subject to the provisions of this act shall print and keep open to public inspection schedules showing the rates and fares and charges for the transportation of passengers and property which any such common carrier has established and which are in force at the time upon its route. The schedules printed as aforesaid by any such common carrier shall plainly state the places upon its railroad between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately the terminal charges and any rules or regulations which in anywise change, affect, or determine any part or the aggregate of such aforesaid rates and fares and charges. Such schedules shall be plainly printed in large type, and copies for the use of the public shall be posted in two public and conspicuous places in every depot, station or office of such carrier where passengers or freight, respectively, are received for transportation in such form that they shall be accessible to the public, and can be conveniently inspected.

"Every common carrier subject to the provisions of this act shall file with the commission hereinafter provided for copies of its schedules of rates, fares and charges which have been established and published in compliance with the requirements of this section, and shall promptly notify said commission of all changes made in the same."

It was proven on the trial that the defendant, a corporation of Indiana, operates an oil refinery at Whiting, Ind.; that the Chicago & Alton Railway Company, a corporation of Illinois, operates a line of railroad from Chicago to East St. Louis, Ill.; that the Chicago Terminal Transfer Railroad Company operates a switching road from Whiting across the state line into Illinois, intersecting the Alton road at a station called Chappell, a short distance from Chicago; that there are three companies operating terminal roads from East St. Louis, Ill., across the Mississippi river to St. Louis, Mo.; that prior to the occurrences upon which this prosecution is based the Chicago & Alton Company had filed with the Interstate Commerce Commission and distributed to its various freight agencies tariff schedules showing the rate for the transportation of oil in car lots from Whiting, Ind., to East St. Louis to be 18 cents per 100 pounds and the rate for like transportation from Chappell to St. Louis, Mo., to be 19½ cents per 100 pounds. These schedules were as follows: Class tariff No. 24 issued by a number of carriers, including the Alton, operating between Chicago and East St. Louis naming a rate of 18 cents per 100 pounds on oil from Chicago to East St. Louis; a joint tariff of the Chicago Terminal and Alton companies providing that the rate from Whiting to East St. Louis shall be the same as the rate from Chicago to East St. Louis, and specifically enumerating class tariff No. 24 above mentioned; schedules of the three St. Louis terminal companies fixing a rate of 1½ cents per 100 pounds from East St. Louis to St. Louis.

It also appeared that the shipments were made over the route covered by these schedules; that is to say, from Whiting to Chappell via the Chicago Terminal road, from Chappell to East St. Louis via the Chicago & Alton road, and from East St. Louis to St. Louis over the lines of the three St. Louis terminal companies. For this service the defendant paid the Alton 6 cents per 100 pounds on the traffic to East St. Louis and 7½ cents for the shipments to St. Louis, bills at

these rates being rendered by the Alton Company to the defendant semimonthly.   Out of the moneys it received from the defendant the Alton Company paid the terminal companies for their part of the service.   With these terminal companies the defendant had no relations whatever save only that the shipments were delivered to the Chicago Terminal Company at Whiting, the point of origin.   At no time did the defendant apply to either of these companies for a rate covering the service they performed, nor did they render any bills to the defendant.   Their dealings were exclusively with the Chicago & Alton Company, to which company, as the defendant's testimony showed, it applied for the through rate from Whiting to destination.

On these facts the court denied defendant's motion that the jury be peremptorily directed to return a verdict of not guilty.   Whereupon, as justifying and excusing the use of the 6-cent rate, the defendant's traffic manager testified that in December, 1902, 1903, and 1904, he applied to the chief rate clerk at the office of the general freight agent of the Chicago & Alton Company for the rate on oil from Whiting to East St. Louis for each succeeding year; that on each occasion the clerk handed him a document purporting on its face to be a special billing order, as follows:

"The Chicago & Alton Railway Company.

"Traffic Department.

"Special Billing Order.

"Issued ——————.   Effective Jan. 1, 1903.
"From ——————, Chicago, Ill.
"To Alton Granite City and East St. Louis, Ill. via ——————.
"On oil and Petroleum Products C L in tank cars.   Rate 6 cents per cwt.
"Expires Dec. 31, 1903.   Unless sooner revoked.
"Collection to be made through Auditor's office.        Chas. A. King,
                                        "General Freight Agent."

This witness also stated that when these special billing orders were delivered to him he received from the rate clerk an Alton tariff schedule called an "application sheet," applying Chicago and East St. Louis rates to similar traffic from Whiting to East St. Louis; that at each of said times the traffic manager inquired of the rate clerk whether the rate had been filed, and was assured by him that it had; that the traffic manager was thus misled by the rate clerk into the honest belief that the rate of 6 cents per 100 pounds as shown by the special billing order from Chicago to East St. Louis had been filed with the Interstate Commerce Commission, and that, acting in this honest belief, payments at the 6-cent rate to East St. Louis and 7½ cents to St. Louis were made.   This special billing order was not and did not purport to have been filed with the Interstate Commerce Commission, nor was it distributed by the Alton Company to any freight agent for use in quoting rates to the general shipping public, with the single exception that, as the rate clerk testified, a copy was retained in the tariff files at the general freight office.   Nor did the application sheet contain any reference to the special billing order, but it did specifically enumerate the Chicago-East St. Louis tariff 24 above mentioned, which tariff 24 showed the Chicago-East St. Louis rate to be 18 cents per 100 pounds.   This alleged occurrence between the

traffic manager and the rate clerk will receive more detailed consideration hereafter.

It is the position of the defendant that the Elkins' law and certain pertinent portions of the Interstate Commerce Law of February 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154], are unconstitutional for the following reasons: First, that the defendant has a natural, inherent right to make a private contract for a railroad rate, of which right the Elkins' law would deprive the defendant by requiring it to pay the rate published and filed by the carrier, and making a failure so to do criminal, in violation as is claimed of the fifth amendment to the Constitution of the United States, which provides that "no person shall be  *  *  *  deprived of life, liberty or property without due process of law"; second, that by authorizing common carriers to establish rates, which when published and filed shall be binding upon the shipper, the law delegates to the carrier legislative power, which section 1 of article 1 of the Constitution confers upon Congress exclusively; third, that the law vests in the Interstate Commerce Commission the power to pass ultimately upon the question of reasonableness or unreasonableness of freight rates as established by a carrier, thereby depriving the defendant of its right to invoke the judgment of the courts in respect thereto, in violation of section 1 of article 3 of the federal Constitution, which vests the judicial power of the United States exclusively in the courts; fourth, that paragraph 3 of section 8 of article 1 of the Constitution, commonly known as the "Commerce Clause," does not empower Congress to forbid and make criminal the act of the defendant in accepting from the carrier a less rate than that published and filed by the carrier as required by section 6 of the Interstate Commerce law.

With respect to the second proposition, it need only be said that the Supreme Court of the United States has in a number of instances ruled adversely to the defendant's contention, in cases where the same question arose on state statutes empowering railroad commissions to fix rates. And the third objection is not sound for the reason that the interstate commerce law does not purport to deprive the courts of their jurisdiction at the suit of a shipper to ultimately determine the question of reasonableness or unreasonableness of a rate.

Respecting the defendant's alleged natural right to make a private contract for a secret railroad rate, candor obliges the court to say that he knows of nothing to support the proposition but the eminence of counsel who advance it. In such case, as in all others, it would require two parties each competent to contract, and, considering the nature of the thing to be contracted for, the railway common carrier is fundamentally incompetent. This is so for the reason that the railway company is a public functionary and is enabled to construct and operate a railroad only by its exercise of the power of eminent domain, which is a sovereign power of government. Thus, by condemnation proceedings, such a corporation may take the real property of the individual citizen, even his homestead, against his will and protest. The theory upon which government authorizes this to be done is that it is necessary for the public welfare, and nothing can

possibly be more plain than that property thus acquired must be used for the benefit of the public; not part of the public, but all of the public. Under the doctrine insisted upon by the defendant, the railway company might give the Standard Oil Company a very low transportation rate, and, by contract, obligate itself to withhold the same rate from the very man the taking of whose property by condemnation rendered possible the construction of the road. A more abhorrent heresy could not be conceived. There is no more reason for the claim of natural right to private contract for the exercise by a railway company of the public power with which it is endowed than there would be for the claim of similar right to private contract with the collector of customs or tax assessor for a secret valuation of property.

It is the defendant's position that the commerce clause does not empower Congress to forbid and make criminal the defendant's act in accepting from the carrier a less rate than that published and filed by the carrier, as required by law. In the court's view, the only point involved in this proposition is whether Congress has authority to require that railroad rates shall be uniform. It being now settled that Congress has this power, it necessarily follows that to preserve uniformity that body may prohibit the doing of any act or thing whatever by any person or corporation calculated to impair uniformity, and may enforce such prohibitions by such penal provisions as Congress may deem requisite.

The defendant maintains that the interstate commerce law does not apply to the Alton Company's connection with the transportation of defendant's property, inasmuch as the road it operates lies wholly within the state of Illinois. The theory is that the haul by the Chicago Terminal from Whiting across the Illinois line to Chappell, and the haul by the St. Louis terminal from East St. Louis across the Missouri line to St. Louis, are each interstate, and therefore subject to federal control, but that the Alton Company's intrastate haul of the same property from Chappell to East St. Louis is beyond the reach of federal authority. The trouble with this contention is that it ignores the basic proposition underlying the whole question, and confuses the intrastate character of the carrier with the interstate character of the commerce in which the carrier is engaged. The true and primary test is whether the commodity to be transported is to pass from one state into another state. If it does so pass, then it is interstate commerce, regardless of whether the rails over which it moves be operated by one or many carriers. And when this commodity begins to move, interstate commerce has begun, and interstate commerce it continues to be until it reaches destination. If in such continuous line there be a road lying wholly within a county in a state, the carrier operating such road, in respect to the movement of that commodity, is engaged in interstate commerce, as clearly as if its line extended from the origin to the destination of the shipment, and is therefore as to such transportation subject to federal control. To adopt the views contended for by defendant, namely, that Congress may prescribe the rate which the shipment must pay for the movement from Whiting to Chappell, and from East St. Louis to St. Louis, and that the Legislature of Illinois may prescribe the rate effective on the link con-

necting these two ends of the route traveled by the commodity, would be to create a situation impossible in practice as it is illogical in theory.

It was insisted by the defendant that the evidence did not show any common arrangement between the Chicago & Alton and the Chicago Terminal companies for a continuous carriage from Whiting to East St. Louis, as charged in the indictment. The evidence did show the filing and publication of a joint tariff schedule of the Chicago & Alton and Chicago terminal companies, putting in force from Whiting to East St. Louis the 18-cent rate, shown by tariff 24 to be the Chicago-East St. Louis rate. Furthermore, these two companies maintained a joint agency at the intersection of their roads at Chappell for the transaction of the business of both at that point, which consisted largely of the Standard Oil traffic from Whiting to East St. Louis. In addition to this, the evidence shows the movement of the defendant's property by the Chicago Terminal Company, that company not looking to the defendant for its compensation but relying solely upon the Alton Company therefor. The whole course of business from the publication and filing of the joint schedule to the payments of the freight charges conclusively shows that these two companies were operating under a common arrangement for the transportation of this property.

The defendant also contends that, inasmuch as the name "Chappell" does not appear on the schedules, there was no lawful rate between Chappell and St. Louis. The evidence does show, however, that tariff 24 named the rate to East St. Louis from Chicago and suburban stations within the Chicago switching district, including the station immediately beyond Chappell from Chicago. Moreover, on the face of the Alton-Chicago Terminal joint schedule appeared the following: "Agents are strictly prohibited from quoting or using a higher rate for a shorter than for a longer distance over the same line in the same direction, the shorter being entirely included within the longer distance." This would seem to clearly exhibit the rate from Chappell. Certainly it would be ample, and to no extent misleading, notification to any shipper consulting the schedule in good faith to learn the lawful rate.

The defendant claims that the evidence fails to sustain the charge in the indictment that the Alton Company was engaged in the transportation of property from Chappell to St. Louis, and that it had published and filed tariff schedules showing the rate in force between said points to be 19½ cents. As before observed, the Alton Company published and filed tariff 24 showing a rate of 18 cents from Chappell to East St. Louis. The evidence also shows that the Alton Company procured copies of the tariff schedules of the St. Louis terminal companies, showing their rate to be 1½ cents from East St. Louis to St. Louis, and filed these schedules in its own name with the Interstate Commerce Commission, distributing the same to its freight agencies where they were kept for the use of the general shipping public. Having thus published and filed the rate covering the entire route, and having actually seen to it that the property reached its St. Louis destination, as its general charter powers authorized it to do, and as the defendant looked to it to do, and paid it for doing, the court is of the opinion that the evidence clearly shows the Alton Company was possessed of a

railroad route from Chappell to St. Louis over which it had established a rate for the transportation of oil as required by law.

If a carrier enters the field for traffic destined to points beyond its line, and a shipper turns his property so destined over to it, such traffic is as clearly subject to the requirements of the Interstate Commerce Law as would be the case if the carrier owned and operated the line through to destination.

In the absence of a formal agreement establishing a joint through rate effective over a through route made up of the connecting lines of more than one carrier, the lawful rate in force over such through route is the sum of the local rates lawfully established by the several connecting carriers over their respective roads. The Alton Company and the St. Louis terminal companies had no joint through agreement, as at their election under the law they might have had. However, it would be wholly inadmissible to hold that the interstate traffic handled by them was immune from federal regulation merely because of this omission.

The defendant offered certain tariff schedules as tending to show that during the period covered by the indictment there was in force by the Chicago & Eastern Illinois Railroad from Whiting to East St. Louis a rate on oil of 6¼ cents, which it was claimed, owing to certain terminal charges at East St. Louis, to which the Alton traffic was subjected, was equal to the 6-cent rate via the latter route. This evidence was offered to etablish an absence of motive on the part of the defendant to accept an unlawful rate from the Alton, but was excluded by the court, as not being admissible on the question of the defendant's guilt or innocence in accepting the unlawful rate from the Alton Company, the court announcing that, if it should subsequently appear that there was in force such open, published, filed rate via the Chicago & Eastern Illinois Railroad available to the general public, that fact would be considered by the court in mitigation of punishment. Motive is not material in a case where the proof is clear that it was the defendant who committed the crime. Motive may be inquired into when necessary to determine the ultimate fact, when in dispute, as to who committed the crime. Schmidt v. U. S., 133 Fed. 263, 66 C. C. A. 389.

The real question is whether the defendant accepted the concession knowingly, and in determining this it need not be affirmatively shown that the defendant had actual knowledge of the lawful rate. The defendant must be presumed to have known that which a diligent endeavor made by an honest man in good faith to ascertain the lawful rate would have disclosed to him. The burden of this diligent endeavor is not to be diminished or increased by the supposed existence or absence of a lawful rate on some other road equal in amount to the rate accepted by the shipper. To adopt defendant's contention would be to impose upon the occasional shipper who cannot employ a traffic manager, and who is not expert in traffic matters, a more rigid requirement than that imposed upon the continuous shipper, by excusing the latter on account of what his large business might enable him to know of rates on other roads from penalties which would be imposed upon the former for the same act. Moreover, it is to be observed that what

a shipper might know respecting rates in force on one road would not inform him of what rates were lawfully in force on another road. The most that can be said for the defendant's contention in this regard is that the shipper might assume the same rates to be in force on competing lines. But the law does not allow him to assume. He must know what he can ascertain by inquiry. The rate once established and available to him on application, he must pay.

The court is not impressed by the doleful predictions of counsel for the defendant as to the hardships upon the honest shipping public to be anticipated from the enforcement of this rule. The honest man who tenders a commodity for transportation by a railway company will not be fraudulently misled by that company into allowing it to haul his property for less than the law authorizes it to collect. For the carrier thus to deceive the shipper would be to deliberately incriminate itself, to its own pecuniary detriment, which it may safely be trusted not to do. The only man liable to get into trouble is he who, being in control of the routing of large volumes of traffic, conceives a scheme for the evasion of the law, and connives with railway officials for its execution.

The defendant argues that the Elkins' law authorizes prosecution for but one offense, and maintains that there can be a conviction on but one count—citing decisions of courts supporting the propositions in cases arising on other statutes. However, in this as in all other cases involving statutory construction it is solely a question of legislative intent. The language of the laws is:

"Every person or corporation who shall offer, grant or give, or solicit, accept or receive any such rebates, concession or discrimination shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than one thousand dollars nor more than twenty thousand dollars."

As the court reads this enactment, the offense is complete whenever any property is transported at less than the lawful rate. If this be true, the law is violated every time any property is so transported. There is nothing in these words deliberately employed by Congress to indicate its intention to be that, if a defendant shall offend habitually, he shall have immunity save only as to one violation. Nor will the court indulge the supposition that this could have been the unexpressed intention of Congress, to be judicially interpreted into the law, in opposition to what appears to be its plain meaning, because such a rule would encourage him who had violated the law on one occasion to disobey it by wholesale in order to thereby accumulate a large fund for his own purse, after paying the fine imposed for the single penalty.

It is also urged that, if this construction be not adopted, the number of penalties should be limited to three, on the theory that but one concession was granted by the railway company and accepted by the defendant each year; the point being that the 6-cent rate was given to the defendant to be effective throughout each one of the three years covered by the indictment. If this theory be not accepted, it is maintained that the number of penalties should be limited to 36, that being the number of bills rendered by the Alton Company at the

6-cent rate, and paid by the defendant; it being urged that the offense, if any, was committed when the money was paid. But the court is unable to accept any of these theories. The offense was committed when the property was transported at the unlawful rate, and the parties could not limit their liability by entering into an agreement to disregard the law for a long period of time, nor by settling their accounts at stated periods. It is the substance of the thing, and not the mere form, with which the law is concerned. The defendant here is in precisely the same position it would occupy if it had paid the Alton Company at the unlawful rate each time a car was shipped. If none of these theories obtain, it is the defendant's position that the number of penalties should be limited to the number of shipments as distinguished from the number of cars transported; the argument being that, inasmuch as the evidence shows that in many instances more than one car of defendant's property went forward in the same train, it must be inferred that in such cases the several cars constituted one shipment, which the defendant contends is the unit contemplated by the law. However, the course of dealing of the parties seems to forbid the application of this rule. The legal rate was established by the railway company on a car-lot basis. The unlawful 6-cent rate was granted and accepted on this basis, and bills were rendered and paid at that rate per car lot, each car being specifically itemized. Moreover, the mere fact that more than one car went forward in the same train would not require the inference that they were all part of one shipment, any more than would the fact that if a shipment of five cars on one order should happen to be moved in five different trains resolve that transaction into five separate shipments. The proof is silent as to what number of cars, if more than one, constituted shipments on specific orders, no evidence having been offered by either party on that point. Because of this the defendant's counsel urged the court to grant a new trial, the claim then being that such a showing was a necessary part of the government's case. In the opinion of the court, the evidence fully justified the jury in finding the defendant guilty on each of the 1,462 counts.

Respecting the defendant's claim that the representations by the Alton rate clerk had misled it into the sincere belief that the Alton 6-cent rate had been filed with the Interstate Commerce Commission, it is proper to recall here that in the opening statement of its case to the jury the defendant asserted its position to be that under the statute the rate need not be filed to make lawful its acceptance by a shipper. Thereafter, during the introduction of defendant's evidence, and while the court was hearing argument with reference to the admissibility of testimony offered by the defendant as tending to show that the railway rate clerk had represented to the defendant's traffic manager that the rate had been filed with the commission, the court asked defendant's counsel whether the traffic manager was in fact so misled. That gentleman being then in court was called into conference by the defendant's counsel, at the end of which counsel stated to the court that the traffic manager "tells me he assumed that the Alton Company did its legal duty in that regard." At the conclusion of the argument the court ruled that, inasmuch as the law required the car-

rier to keep the schedule at its freight office for public inspection, and made it a misdemeanor for the shipper to accept a rate that was not thus published by the carrier and filed with the Interstate Commerce Commission, it was the defendant's duty to make a diligent endeavor in good faith to ascertain at the carrier's office whether the rate had been so filed; that the defendant was chargeable with such knowledge as this inquiry would have disclosed; and that, therefore, evidence was admissible tending to show that the defendant made the inquiry and was misled by the railway company into innocently believing that the rate had been filed, it being for the jury to determine whether such testimony exhibited the truth of the transaction. Thereupon the traffic manager was called to the stand, and testified that on each of the three occasions when he received the special billing order naming the 6-cent rate he had inquired of the rate clerk whether the rate had been filed and was informed that it had been. It was because of these occurrences, some of which took place in the absence of the jury, that the court directed the jury to subject to very careful scrutiny the testimony of the traffic manager and the rate clerk on this subject. If the traffic manager merely assumed the rate had been filed, of course he did not on three occasions specifically ask whether it had been filed. A jury is not required to accept an obviously improbable thing as true, merely because in a lawsuit a witness may testify to its having happened.

In the federal court, on a verdict of guilty, it is the duty of the court to fix the punishment. The defendant having offered certain tariff schedules on the trial as tending to show that during the period covered by the indictment there was available to it and the general shipping public via the Chicago & Eastern Illinois road an open, published, lawful rate of 6¼ cents from Whiting to East St. Louis, which rate it was represented was equal to the 6-cent rate via the Alton road, owing to certain terminal charges to which traffic via that route was subject at East St. Louis, and the court being of the opinion that this fact if true should be considered in mitigation, although inadmissible before the jury on the question of guilt or innocence, the court after verdict directed the production of all schedules bearing on the Chicago & Eastern Illinois rate. From these it appeared that in September, 1895, the Eastern Illinois Company, in connection with the C. C. C. & St. L. and other railway companies, issued and filed with the Interstate Commerce Commission joint tariff No. 7,986. This was a class tariff, and fixed a rate of 18 cents per 100 pounds on oil from Chicago to East St. Louis. On October 9, 1895, the Eastern Illinois Company issued and filed with the Interstate Commerce Commission its commodity tariff No. 8,073 fixing a rate of 6¼ cents per 100 pounds on oil from Dolton, Ill., to East St. Louis, and providing that out of this rate a switching charge of not to exceed three dollars per car would be absorbed on shipments from Whiting, Ind. July 1, 1903, 60 days prior to the beginning of the period covered by the indictment in this case, the Eastern Illinois Company issued its joint tariff No. 17,679. This general class tariff provided that between Chicago suburban stations, including Whiting, Ind., and East St. Louis, Ill., "the current rates in effect from Chicago, Ill., should apply, ex-

cept on coal, coke, grain, and grain products, lumber, and articles taking the same rates or arbitraries higher, live stock, and hay." Oil was not included in the commodities thus excepted from these class rates. Among the tariffs specifically named in connection with which this schedule was to be effective were tariff No. 7,986, above mentioned, which fixed a rate of 18 cents per 100 pounds on oil from Chicago to East St. Louis, and tariff No. 24 hereinbefore referred to, to which the Eastern Illinois road was a party, which is described as a tariff on "classes and commodities between Chicago and East St. Louis," and which also showed the rate on oil to be 18 cents.

This tariff 17,679 was distributed by the Eastern Illinois Company to all of its freight agents, and filed with the Interstate Commerce Commission. Its effect was to exhibit to the general shipping public a rate of 18 cents on oil from Whiting to East St. Louis. It was not, however, included among the schedules offered in evidence by the defendant for the purpose of establishing a 6¼-cent rate on oil.

On July 7, 1903 (one day after this tariff became effective), the Eastern Illinois Company, apparently recognizing that the effect of this tariff was to nullify the 6¼-cent rate shown by its schedule No. 8,073 effective in October, 1895, issued what it denominated "amendment No. 1 to tariff No. 7,986," that being the Eastern Illinois class tariff of September, 1895, which had fixed a rate of 18 cents per 100 pounds on oil from Chicago to East St. Louis and which was embraced within the general class tariff 17,679 above referred to. This amendment purported to cancel the 6¼-cent Whiting-East St. Louis oil rate shown on tariff 8,073 filed with the commission in October, 1895, and named a commodity rate on oil of 6¼ cents per 100 pounds from Chicago and Dolton Junction, Ill., to East St. Louis. However, this amendment No. 1 was not filed with the Interstate Commerce Commission until March, 1906, one year after the expiration of the period covered by the indictment, and nearly three years after its issue. In view of these facts the Eastern Illinois situation cannot serve the purpose in this case of excusing, or to any extent palliating, the defendant's acceptance of the unlawful Chicago & Alton 6-cent rate.

For the guidance of the court in determining the penalty to be fixed in this case, the court requested counsel to furnish information as to what, if any, corporation held the stock of the defendant Standard Oil Company of Indiana, what the outstanding capital stock of such holding company was, and what its net earnings and dividends were for the three years covered by the indictment. This information which the court deemed it to be his duty to obtain in order that he might advisedly exercise the discretion required by law in fixing the punishment, the defendant's counsel, after deliberation, refused to give. The court, therefore, caused subpœnas to be issued requiring the presence here of the principal officers of the Standard Oil Company of Indiana and the Standard Oil Company of New Jersey. Defendant's counsel thereupon applied to the court to recall these subpœnas, representing that such principal officers were not in possession of the information sought by the court, and suggesting that the subpœnas be limited to a certain person who, it was stated, had the information, and whose name counsel offered to give to the

court. In response to the court's inquiry, however, as to whether such person would testify or refuse to answer, should this course be adopted, the statement was made that he might decline to answer on the advice of counsel. Therefore, being of the opinion that if there was to be such refusal to testify it ought not to come from some subordinate selected by the defendant for that purpose, the court declined to recall the subpœnas. Accordingly, they were duly served. On the examination of the president and secretary of the Standard Oil Company of New Jersey, it appeared that a very large proportion of the stock of the defendant Standard Oil Company of Indiana was held by individuals for the stockholders of the Standard Oil Company of New Jersey; that the outstanding capital stock of the Standard Oil Company of New Jersey was approximately $100,000,000; that the annual dividends of that company during the three years covered by the indictment were approximately 40 per cent.; and that its net earnings for the period mentioned were approximately $200,000,000. It also appeared from a certified copy of a resolution of the stockholders of the Standard Oil Company of Indiana increasing its capital stock that of its million dollar capital all but four $100 shares were owned by what is called "Standard Oil Trust."

The enforced attendance and testimony of these witnesses was resisted as extrajudicial and unwarranted. The rule governing the proceeding as found in Bishop's New Criminal Law, Vol. 1, §§ 948 and 950, is as follows:

"The entire transaction in which a crime was committed may embrace more of wickedness than the indictment charges; or there may be other circumstances of aggravation on the one hand, or of mitigation on the other. Therefore, if the law has given the court a discretion as to the punishment, in pronouncing sentence it will look into any evidence proper to influence a judicious magistrate to make it heavier or lighter. * * * Or this sort of evidence may be delivered to the jury at the trial if with it is the assessment of the punishment. But we have authority for the proposition that in such a case the aggravating matter must not be of a crime separate from the one charged in the indictment—a rule perhaps not applicable where the court determines, after verdict, the punishment. * * * This evidence, thus addressed to the discretion of the judge, need not be attended by the formalities required on the main issues before the jury. The court will now, if it sees no reason to order otherwise, listen to ex parte affidavits. And even hearsay evidence, inadmissible on general principles, has under special circumstances been suffered on this issue. A witness may be compelled by subpœna to be present."

From the defendant's formal refusal to furnish the court with this information subsequently brought out on the hearing the court quotes the following language of counsel:

"I will not be understood as saying that upon the application for judgment upon the verdict either party may not urge consideration which may be fairly made from the evidence introduced before the court upon the trial. And it is proper for the defendant to present circumstances which he could not introduce in evidence upon the trial in mitigation of the penalty. The defendant here reserves its rights in that respect, and whenever the question is considered as properly arising in the case, whether now or at some later day, the defendant will be prepared to present such considerations as it may be advised are proper, if there is occasion therefor."

In view of this statement, and at the conclusion of the supplementary examination of the officers of the Standard Oil Company of New Jersey, above referred to, the court offered to hear any evidence that might be submitted by the defendant as tending to show that neither it nor the Standard Oil Company of New Jersey had ever violated the interstate commerce law before, such evidence to be considered by the court in mitigation of punishment.

On the following Monday the defendant's counsel presented to the court its formal reply, denying the propriety of such an inquiry, and declining of its own motion to submit anything. From this document the court quotes the following:

"For this defendant now to assert its innocence of matters that it is not charged with, or attempt to show that it has been innocent of any wrongdoing in connection with matters outside of this record, when there is nothing before the court charging it with such wrongdoing, would present a situation unheard of in Anglo-Saxon jurisprudence. This court, in the absence of anything to the contrary, paying no attention to the gossip of the street or the charges of the mob, and guided by the fundamental law of the land, must certainly presume the complete innocence of this defendant of any prior violations of the interstate commerce law, and fix its penalty, if any, solely upon the record in this case."

And again:

"If the occasion, however, shall ever arise in an appropriate proceeding, where this defendant can, without any waiver of its legal rights or legal status, subject itself to an investigation of the question of its having heretofore violated the interstate commerce law, it will avail itself of that opportunity, and it will certainly appear that since the passage of that law there has been no violation of its provisions by either the Standard Oil Company of New Jersey or by this defendant; but on the contrary it has been the fixed policy of these companies since their organization and the passage of the interstate commerce law to strictly observe not only the letter, but the spirit, of all interstate commerce laws, and that such laws have since their passage met with the entire approval of the administrative officers of these companies."

Waiving the question of the studied insolence of this language, in so far as it may be aimed at the present occupant of the bench, the court can, of course, only leave to the discretion of the Standard Oil Company the wisdom and propriety of a hundred million dollar corporation gratuitously inaugurating agitation about the "mob." The point of this incident is that, when in compliance with defendant's previously expressed reservation the court offered to hear evidence going to the question of the Standard Oil Company's prior good behavior, an offer which was announced by the court in the presence of the president, the vice-presidents, and secretary of the Standard Oil Company of New Jersey, their counsel, after conference, declined to present any witness to testify on this subject, choosing rather to stand upon the law's presumption of innocence. Of course, on the trial of a defendant for a specific offense, this presumption is indulged in favor of that defendant as to that offense; but where, as in this case, the crime charged was the acceptance of a preferential railroad rate, in violation of a law that had been on the books for nearly 20 years; where during a period of 18 months 1,900 car loads of property were shipped at an unlawful rate, which amounted to but one-third of the rate available to the general shipping public; where the convicted de-

fendant's transportation affairs were in the charge of an expert traffic official of at least ordinary intelligence and many years railroad traffic experience, and who was a frequent visitor at the general freight office of the railway company; where the unlawful rate was shown only by a paper appearing on its face to be a special billing order, and which directed that settlement for services rendered at the rate which it authorized should be made through the railway company's auditor's office instead of at the railway station or freight office, as is done by the general shipping public; and where the defendant when brought to trial persistently maintains that the Constitution of the United States guarantees to it the right to make a private contract for a railroad rate—this court is obliged to confess that he is unable to indulge the presumption that in this case the defendant was convicted of its virgin offense.

It is the defendant's position that its offense was wholly technical; that nobody has been injured, because there was no other shipper of oil; and that, therefore, the punishment, if any, should be a modest fine. This impresses the court as a peculiar argument. It is novel indeed for a convicted defendant to urge the complete triumph of a dishonest course as a reason why such course should go unpunished. Of course, there was no other shipper of oil, nor could there be so long as by a secret arrangement the property of the Standard Oil Company was hauled by railway common carriers for one-third of what anybody else would have to pay. It requires no very great wisdom to understand that if other men of capital, genius, and integrity should embark in the oil business, and possess themselves of all the facilities known to the trade, the methods unveiled in this proceeding would force them out. The only way for them to stay in the oil business would be for them to adopt the practice of this defendant, and procure the great public power of railway companies to be secretly perverted in their interest. Under no other possible theory could they hope to survive. Nor is this the only injury. To the extent that the Standard Oil Company has not paid what the law required it should pay, the shippers of other kinds of property have had to bear the burden. To the rate which it would be fair for the railway company to charge for the transportation of products of the farm and factory has been added what the Standard Oil Company did not pay for the transportation of its property. And herein lies not the least vicious element of such a system. In addition to this is the question of common honesty among men, which ought not to be altogether ignored in business even in this day. The conception and execution of such a commercial policy necessarily involves the contamination of subordinate officers or employés, even looking to the time when testimony will be required for the protection of the revenues of the offender from the exactions of the law for its violation. We might as well look at this situation squarely. The men who thus deliberately violate this law wound society more deeply than does he who counterfeits the coin or steals letters from the mail.

The nominal defendant is the Standard Oil Company of Indiana, a million dollar corporation. The Standard Oil Company of New Jersey, whose capital is $100,000,000, is the real defendant. This is so for the

reason that if a body of men organized a large corporation under the laws of one state for the purpose of carrying on business throughout the United States, and for the accomplishment of that purpose absorb the stock of other corporations, such corporations so absorbed have thenceforward but a nominal existence. They cannot initiate or execute any independent business policy, their elimination in this respect being a prime consideration for their absorption. So, when after this process has taken place a crime is committed in the name of such smaller corporation, in fixing punishment the law will consider that the larger corporation is the real offender. And where the only possible motive of the crime is the enhancement of dividends, and the only punishment authorized is a fine, great caution must be exercised by the court lest the fixing of a small amount encourage the defendant to future violations by esteeming the penalty to be in the nature of a license. The defendant argues that to hold it for 1,462 offenses would be a violation of the constitutional prohibition against the imposition of excessive fines, and it is urged that Congress could never have intended to confer upon the court such power. It is the view of the court that for the law to take from one of its corporate creatures as a penalty for the commission of a dividend producing crime less than one-third of its net revenues accrued during the period of violation falls far short of the imposition of an excessive fine, and surely to do this would not be the exercise of as much real power as is employed when a sentence is imposed taking from a human being one day of his liberty. In this connection, it may be observed that the figures exhibiting the net earning of the Standard Oil Company of New Jersey during the period covered by this indictment are exceedingly instructive because of the peculiarly intimate relation between the character of the crime and the revenues of the offender.

The law prohibiting preferential railroad rates was passed 20 years ago. Its adoption was preceded by vigorous opposition interposed by those who had been the beneficiaries of the vicious practices its enactment was designed to abolish. Immediately thereafter, these persons set about to devise means for its evasion. The records of the courts and of the Interstate Commerce Commission show the employment of a large variety of schemes to accomplish this result. During the period since 1887 Congress has repeatedly endeavored to effectively amend the law with a view to the accomplishment of its great object. Finally, in 1903 the Elkins' law was passed. The court recalls that at that time the earnest hope was very generally entertained that at last a means had been devised that would put an end to preferential railroad rates, and yet beginning a few months thereafter the Standard Oil Company procured 1,900 car loads of property to be shipped at an unlawful secret rate. And for this offense the Elkins' law authorizes punishment only by fine, an obvious defect, remedied, however, by the present law which prescribes imprisonment in the penitentiary for the like offense. However, it is the business of a judge to administer the law as he finds it rather than to expatiate upon the inadequacy of punishment authorized for its infraction.

It is the judgment and sentence of the court that the defendant, Standard Oil Company, pay a fine of $29,240,000.

One thing remains. It must not be assumed that in this jurisdiction these laws may be ignored. If they are not obeyed, they will be enforced. The plain demands of justice require that the facts disclosed in this proceeding be submitted to a grand jury with a view to consideration of the conduct of the other party to these transactions. Let an order be entered for a panel of 60 men returnable at 10 o'clock on the morning of August 14th. The United States District Attorney is directed to proceed accordingly.