### STANDARD OIL CO. OF INDIANA v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit. July 22, 1908. On Rehearing, November 10, 1908.)

#### No. 1,409.

1. CARRIERS (§ 38*)—OBTAINING ILLEGAL CONCESSION—SHIPPER'S LIABILITY—LAWFUL RATES—KNOWLEDGE—EVIDENCE.

Under Elkins Act Feb. 19, 1903, c. 708, 32 Stat. 847, § 1 (U. S. Comp. St. Supp. 1907, p. 880), making it unlawful for any person or corporation to accept or receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce, and requiring the filing and publication of interstate rates, a shipper cannot be convicted of accepting a concession from the lawfully published rate without proof of knowledge of what such rate in fact was; and hence evidence that the shipper had no knowledge of the published rate, and could only have ascertained the same by construction of several tariff sheets, the application of which was questionable, was admissible.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 38.*]

2. CARRIERS (§ 38*) — ILLEGAL CONCESSIONS — PROSECUTION OF SHIPPER — "TRANSACTION"—COMPLETED OFFENSE.

Elkins Act Feb. 19, 1903, c. 708, 32 Stat. 847, § 1 (U. S. Comp. St. Supp. 1907, p. 880), prohibits any person or corporation from receiving any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce, etc., and declares that every person or corporation who shall accept or receive any such rebates or concession shall be guilty of a misdemeanor, and on conviction be fined, etc. Held, that the gist of the offense was the receipt of a concession, irrespective of whether the property involved was train loads, car loads, or pounds, and consisted of the "transaction," which was not completed until the shipper received a rate different from the established rate, without reference to the size of the shipment.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 38.*]

3. CARRIERS (§ 38*)—ILLEGAL CONCESSIONS—SENTENCE—ABUSE OF DISCRETION.

Defendant, Standard Oil Company of Indiana, was found guilty on 1,462 counts of an indictment for receiving concessions from a railroad company on shipments of oil, in violation of Elkins Act Feb. 19, 1903, c. 708, 32 Stat. 847, § 1 (U. S. Comp. St. Supp. 1907, p. 880). Defendant's capital stock was $1,000,000, and there was no evidence that its assets

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

were in excess of that sum, nor did it appear that defendant had ever before been guilty of a similar offense. A majority of defendant's capital stock was owned by the Standard Oil Company of New Jersey. which was no party to the prosecution, whose capital stock was $100,000,000. This corporation was a holding company, and its net earnings for the period during which the concessions were received the court investigated before passing sentence. *Held*, that the assessment of the fine of $29,-240,000, which was the maximum punishment on each count, based on a finding that such amount was less than one-third of the net revenues of the Standard Oil Company of New Jersey during the period of violation, the effect of which would be to bankrupt the defendant, was excessive, and an abuse of discretion.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 38.*]

In Error to the District Court of the United States for the Northern Division of the Northern District of Illinois.

For opinion below see 155 Fed. 305.

John S. Miller and Moritz Rosenthal, and Alfred D. Eddy, for plaintiff in error.

Edwin W. Sims, U. S. Dist. Atty., and James H. Wilkerson, Sp. Asst. U. S. Atty.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

GROSSCUP, Circuit Judge. The writ of error is to the judgment and sentence of the District Court, fining plaintiff in error in the sum of twenty-nine million, two hundred and forty thousand dollars, upon a verdict of guilty upon 1,462 counts of an indictment, each charging plaintiff in error with having, on a date mentioned within the period from September 1, 1903, to March 1, 1905, unlawfully and knowingly accepted and received from the Chicago & Alton Railway Company a concession in respect of the transportation of certain property of plaintiff in error therein mentioned, in interstate commerce, whereby such property was transported, in such interstate commerce, at a rate less than that named in the tariffs published and filed by said Railway Company, as required by the act to regulate commerce and the acts amendatory thereof.

The indictment is based upon section 1 of the Act approved February 19, 1903 (32 Stat. 847, c. 708 [U. S. Comp. St. Supp. 1907, p. 880]), formerly known as the "Elkins Act," wherein it was provided:

"That it shall be unlawful for any person, persons or corporation, to offer, grant or give, or to solicit, accept or receive any rebate, concession or discrimination in respect of the transportation of any property in interstate or foreign commerce, * * * whereby any such property shall, by any device whatever, be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereto, or whereby any other advantage is given, or discrimination is practiced. Every person or corporation who shall offer, grant, or give, or solicit, accept or receive, any such rebates, concession or discrimination, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than one thousand dollars or more than twenty thousand."

The fine actually imposed, was the maximum penalty provided.

The provision of the interstate commerce act relating to the publishing and filing of rates is as follows:

"Sec. 6. That every common carrier subject to the provisions of this act shall print and keep open to public inspection schedules showing the rates, and fares and charges for the transportation of passengers and property which any such common carrier has established and which are in force at the time upon its route. The schedules printed as aforesaid by any such common carrier shall plainly state the places upon its railroad between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately the terminal charges and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares and charges. Such schedules shall be plainly printed in large type and copies for the use of the public shall be posted in two public and conspicuous places in every depot, station or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public and can be conveniently inspected. * · * *

"And when any such common carrier shall have established and published its rates, fares and charges, in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect or receive from any person or persons, a greater or less compensation for the transportation of passengers or property, or for any services in connection therewith, than is specified in such published schedules of rates, fares and charges as may at the time be in force.

"Every common carrier subject to the provisions of this act shall file with the Commission hereinafter provided for, copies of its schedules of rates, fares, and charges which have been established and published in compliance with the requirements of this section, and shall promptly notify said Commission of all changes made in the same. Every such common carrier shall also file with said Commission copies of all contracts, agreements, or arrangements with other common carriers, in relation to any traffic affected by the provisions of this act, to which it may be a party. And in cases where passengers and freight pass over continuous lines or routes operated by more than one common carrier, and the several common carriers operating such lines or routes establish joint tariffs of rates, or fares, or charges for such continuous lines or routes, copies of such joint tariffs shall also, in like manner, be filed with said Commission. Such joint rates, fares and charges on such continuous lines, so filed as aforesaid, shall be made public by such common carriers when directed by said Commission, in so far as may, in the judgment of the Commission, be deemed practicable; and said Commission shall from time to time prescribe the measure of publicity which shall be given to such rates, fares, and charges, or to such part of them as it may deem it practicable for such common carriers to publish, and the places at which they shall be published."

Act March 2, 1889, c. 382, § 1, 25 Stat. 855 (3 U. S. Comp. St. 1901, p. 3156; 3 Fed. St. Ann. 827–829).

Each count of the indictment is based upon a car load of petroleum and products of petroleum, irrespective of the number of pounds, carried by such car (in some cases thirty thousand pounds, in other cases eighty thousand pounds) and irrespective, also, of whether the car constituted the whole or a part only of an actual shipment—the plaintiff in error being convicted of as many offenses as there were car loads, although each car load was in some instances but one only, in a number of car loads that made up the shipment.

From 1 to 885 inclusive, the counts charge, that during the period covered by the shipment, the said Chicago & Alton Railway Company, as required by law, kept open for public inspection at Whiting and Chappell, its printed tariffs and schedules then in force upon its route; and, as required by law, filed copies of such tariffs and schedules with the Interstate Commerce Commission; which tariffs and schedules, so published and filed, showed the rate for the transportation of petro-

leum and products of petroleum, in car load lots, from Whiting, Indiana, to East St. Louis, Illinois, to be eighteen cents per one hundred pounds, all of which was well known to the plaintiff in error; but that said Railroad Company, at the request, and on account of said plaintiff in error, did unlawfully engage in the transportation in interstate commerce from Whiting to St. Louis, of the property named, at a total rate and charge to said plaintiff in error, for such transportation, of six cents for each one hundred pounds, under a common arrangement between the said Railway Company and the Chicago Terminal Transfer Railroad Company, for continuous carriage and shipment of such property from Whiting to East St. Louis; wherefore the plaintiff in error unlawfully did knowingly accept and receive from said Railway Company, the concession named. The remaining counts of the indictment from 886 to 1903 inclusive, are in the same form as the previous counts (except as to the dates, weight, description of property, number, of car and the like) with this exception, that the transportation was charged to be from Chappell, in Illinois, to St. Louis in the State of Missouri—the published tariff being charged to be nineteen and one-half cents per one hundred pounds, and the total rate and charge to plaintiff in error being seven and one-half cents for each one hundred pounds.

There are one hundred and sixty-nine assignments of error, taking up seventy-six pages of the printed record. In view of the conclusion, however, to which we have come, it is unnecessary to review many of these assignments—the ones reviewed covering all the propositions of law that we deem essential to the guidance of the District Court in the event of a second trial. Comprehensively stated, the assignments of error that we shall review, relate:

First: To the view adopted by the trial court, carried out in its rulings on the admission and exclusion of evidence, and embodied in its charge to the jury, that a shipper can be convicted of accepting a concession from the lawfully published rate, even though it is shown, as bearing on the matter of intent, that the shipper, at the time of accepting such concession, did not know what the lawfully published rate actually was;

Secondly: To the view adopted by the trial court that the number of offenses is the number of car loads of property transported, irrespective of whether each car load constituted the whole or a part only, of a single transaction resulting in a shipment; and

Thirdly: Whether, in the imposition of the fine named, the trial court abused the discretion vested in the court.

We shall take up these subjects in the order stated, the first being whether a shipper can, without error, be convicted of accepting a concession from the lawful published rate, even though it is shown, as bearing on the matter of intent, that the shipper, at the time of accepting such concession, did not know what the lawful published rate actually was—a view of the law that is embodied in the charge, and carried out in the ruling excluding certain proffered testimony including, as a result of the charge on that point, the testimony of one Edward Bogardus, who, being in absolute charge of the traffic affairs of plaintiff in error during the period covered by the transac-

tions, was offered to testify on that point, that during the period involved, he did not know anything about an eighteen cent rate over the Alton Railroad; that his attention had never been called to any such rate by any person, or by the examination of any document; and that it was his understanding and belief, based on what he was told by one Hollands, Tariff Clerk for the Alton Railroad, that the rate over the Alton road was six cents; and that such rate had been filed with the Interstate Commerce Commission.

Hollands, who was called by the government, had previously testified that he had no recollection of telling Bogardus that the six cent rate (a commodity rate) had been filed with the Interstate Commerce Commission. But answering on his voir dire, the jury being excused, Hollands further stated that he regarded six cents per one hundred pounds as the oil rate between Whiting and East St. Louis; that he regarded a certain application sheet, which covered Whiting at Chicago rates, and the sheet for Chicago, taken together, as showing a six cent commodity rate; that whenever he spoke of a rate on this commodity between Whiting and East St. Louis, he had in mind those papers; and that if he had been asked by Bogardus or anybody else, whether there was a rate between Whiting and East St. Louis, he would have answered that there was, and that it was filed, and that such rate was six cents; which evidence thus proffered was excluded by the court, for the sole reason that, as a matter of fact, as the court (not the jury) found the fact to be, the application sheet containing this six cent commodity rate had not been filed with the Interstate Commerce Commission. Had the court found, as a fact, that that sheet had been so filed, or, submitting that question to the jury, had the jury found that that sheet had been so filed, the six cent rate given to Bogardus admittedly would have been the lawful published rate.

In addition to this, Bogardus was offered as a witness to prove that a tariff prescribing a rate of six and a quarter cents per one hundred pounds from Whiting to East St. Louis was issued by the Chicago & Eastern Illinois Railroad Company, a competing line, October 9th, 1895, and filed with the Interstate Commerce Commission October 11th, 1895; that such tariff sheet was among the tariff files in possession of the plaintiff in error; that plaintiff in error, during the period named, shipped thereunder a large number of cars of petroleum and its products, from Whiting to East St. Louis, over the Eastern Illinois, at said rate; and that such rate of six and a quarter cents was equivalent, to the shipper, of the rate of six cents over the Alton, owing to a quarter of a cent terminal charges, all of which evidence was excluded, as also the offer of the tariff sheet itself, produced from the files of the Interstate Commerce Commission, and an amendment thereto filed in April, 1903.

The relation between the action of the trial court in thus excluding this evidence, and the charge of the court on the subject of knowledge, is apparent. The view embodied in the charge is as follows:

"The indictment alleges that the defendant accepted the concession knowingly. To sustain this averment the proof need not establish that the defendant had actual knowledge of the lawful rate. It was the duty of the defend-

ant to diligently endeavor in good faith to get from the Chicago & Alton Company the lawful rate by applying to the Alton Company at one of its freight or traffic offices or depots. In making this endeavor the defendant is presumed to have known that the Railway Company would be guilty of a misdemeanor if it gave the defendant a rate on interstate traffic which was not set down on paper, and a copy of the schedule filed with the Interstate Commerce Commission. The defendant must also be presumed to have known that the defendant would be guilty of a misdemeanor if it accepted a rate for the transportation of property in interstate commerce which was lower than a rate thus published at a railway station or traffic office and filed with the Interstate Commerce Commission.

"The defendant must be held to have known that which this diligent endeavor would have enabled it to find out. Therefore, if you believe from the evidence beyond a reasonable doubt that such endeavor on the part of the defendant would have enabled it to ascertain the lawful rate as I have defined lawful rate to you in these instructions, and that the defendant did not make the endeavor in good faith, such failure on defendant's part will not excuse defendant, and you will find it guilty on those counts of the indictment, if any, which under these instructions, you find sustained by the evidence."

Of course if this view of the law is sound, the action of the court, in its rulings on the evidence offered, as well as its charge, is without error; for if a shipper can be held guilty of accepting a concession from the lawful published rate, even though the shipper had no knowledge of what the lawful published rate was—if the plaintiff in error, in the transactions before us, was bound, at its peril, first to successfully disentangle the Alton's confused tariff sheets, and then correctly to interpret them—the evidence excluded could have had little determinative weight in any judgment of the jury upon the guilt or innocence of the shipper. But if, on the contrary, it is necessary to a conviction of a shipper of accepting a concession from the lawful published rate, that it should appear as bearing on intent, that the shipper knew what the lawful published rate was, the evidence offered and excluded clearly relates to the fact of such knowledge, and was erroneously excluded, because the plaintiff in error was thereby deprived of its right to have the judgment, not of the court alone, but of the jury as to whether the plaintiff in error had such knowledge as charged him with an intent to violate the law. Indeed the whole question is the fundamental one of whether a shipper is guilty, under the Interstate Commerce Act, of having accepted a rate less than the lawful published rate, even though he does not know, at the time, that the rate accepted was in fact less than the published rate, thereby having no intent to violate the law; or, as the Supreme Court stated the question in Armour Packing Company v. United States (decided March 16, 1908) 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681, whether "shippers who pay a rate under the honest belief that it is the lawful published rate when in fact it is not, are liable, under the statute, because of a duty resting on them to inform themselves as to the existence of the elements essential to establish a rate as required by law."

The trial court was doubtless influenced by judicial holdings in cases under statutes against smuggling, the sale of liquors to minors, and other cases arising out of fiscal and police regulations, for the mere violation of which, irrespective of the motive or intent, certain penalties are enforced (Greenleaf on Evidence, § 21; 1 Wharton Crim.

Law (10th Ed.) § 23a; United States v. Bayard (C. C.) 16 Fed. 376 and other cases cited); and thus influenced, proceeded on the view that if the shipper can, by diligent endeavor, decipher out of the tariff sheets, no matter how entangled or confused they may be, a rate that a court, upon subsequent investigation, no matter how close the question thus raised may be, determines to be the lawful published tariff rate, under all the circumstances named, the shipper may not plead that under information from the carrier or any other investigation short of diligent research on his own account, he mistook another rate to be the lawful published rate—may not plead that he had no intent to violate the law.

In this interpretation of the interstate commerce law, so far as it relates to shippers, we cannot concur. The cases cited by the government, such as those requiring liquor sellers, at their peril, to know whether the person to whom a drink is sold, is a minor, or within the prohibitions of the act or not, are not controlling, nor very persuasive. The Interstate Commerce Act was intended to promote, not to restrain trade and commerce—to secure fair dealing in commerce through uniformity, not to put obstructions in the way of commerce. Texas & Pacific R. R. v. Interstate Commerce Com., 162 U. S. 197, 16 Sup. Ct. 666, 40 L. Ed. 940. Surely the farmer who brings his produce to town to be shipped to the city markets, or the small merchant shipping to the country, or the householder who ships his furniture, when changing his residence, were not meant by the interstate commerce law to be guilty of having accepted a concession, merely because they took the word of the carrier or his agent, as to what the rate was, accepting such rate stated, in the honest belief that it was in fact the regularly established rate. In this respect the shipper and the carrier stand on different ground. The carrier is required by a separate provision of the law to establish and publish rates (section 6) and is forbidden to charge or collect from the shipper a rate greater or less than such established and published rate; and as to the carrier, the doctrine laid down by Wharton and by Judge Cooley in Bonker v. People, 37 Mich. 4, that ignorance of the fact is no defense is perhaps applicable; for the carrier having established and filed the rate, can very justly be denied the right to plead that he overlooked or forgot the rate that he has thus knowingly established and filed. But is the ordinary shipper, under any reasonable view of the situation to which the law relates, thus bound—bound at his peril, under this law intended to promote commerce, to cipher out, before he can safely put anything that he has into commerce, all the confusing papers and figures that generally make up the tariff sheet? Plainly not, it seems to us. As to him, the language of Bishop (1 Bishop, New Criminal Law, § 286) seems sound, that:

"It is never right to punish a man for walking circumspectly in the path which appears to be laid down by the law, even though some fact which he is unable to discover renders the appearance false. And for the Government, whether by legislation or by judicial decree, to inflict injustice on a subject, is to injure itself more than its victim. And the court should, in all circumstances, so interpret both the common law and the statutes as to avoid this wrong."

And though it is true that large shippers like the plaintiff in error do not usually take the word of the carrier as to what the rate is, but examine for themselves the tariff sheets, and have all the knowledge that is necessary to an intelligent examination, from which it might easily follow, as a matter bearing wholly on the weight of the evidence, that professions of ignorance upon the part of such shipper would stand on a different plane of credibility from a plea of ignorance put forward by the ordinary shipper, it does not, on that account, follow that the ultimate question of intent, to be submitted to the jury, is not the same whether the shipper be a large one, or a small one; for the law is the same for all shippers, and the duty devolving on the government is the same, viz.: that before conviction, there must be proof of all the facts upon which the shipper's offense is predicated.

This view of what is essential to constitute the offense, makes it plain that the trial court was in error, as a matter of law, in the application, to the case of a shipper, of the principles that the trial court applied to this case. And this error is made all the plainer, lifting it from what might otherwise be considered a mere technical error, to the level of a real substantial error, when the exact nature of the so-called tariffs published and filed, relied upon by the government as· the lawful rate, are scrutinized; and when the rate that the trial court deciphered out of these papers, is compared with admitted rates on other roads for the same products, and with the admitted rates on the same road for like products. The tariff sheet relied upon as the lawful published rate filed with the Interstate Commerce Commission, is tariff sheet No. 24 of the Chicago & St. Louis Traffic Association; and the first thing to be noted is that this tariff sheet No. 24 makes no reference, by name, to petroleum or the products of petroleum. On the face of that tariff sheet, no eighteen cent rate for petroleum or the products of petroleum appears. The eighteen cent rate was only arrived at by a process of circumlocution; that is to say, on the face of these tariff sheets there was found the printed line "Governed by Illinois classification except as noted herein"; then by turning to a classification adopted by the Railroad & Warehouse Commission of Illinois, September 7th, 1899, it was found that petroleum and its products were set down in the "fifth" class; and then by turning back to tariff sheet No. 24, it was found that the rate set down for the "fifth class" was eighteen cents per one hundred pounds. And so, out of this process of reference and cross reference, the lawful published rate was evolved by the trial court to be eighteen cents, not because it so appeared on the face of the tariff sheets, but because, by reference to other sheets—sheets fixing, not rates, but classification, and that not by the Interstate Commerce Commission or the carrier, but by the Illinois Railway Commission—it could be so figured out.

Now many nice judicial questions are raised, in this case, upon the accuracy and validity of the result thus arrived at. Tariff schedule No. 24, for instance, with the words thereon printed, "Governed by Illinois Classification," took effect May 15th, 1899. The Illinois classification, that the government relies upon as adoption by reference, was not adopted until nearly four months afterwards, to-wit, September 7th, 1899. No proof is in the record either of the terms or the

existence of any Illinois classification as of May 15th, 1899, the time the tariff sheet was filed. Do the words, "Governed by Illinois Classification" refer to a classification presently in existence—the classification in existence when the tariff was filed? If so, the proof fails, for no such classification is shown. Are the words to be interpreted as if they read: Governed by Illinois Classification "as from time to time that classification may be changed"? If so, it is only because words not expressed are to be judicially imported into the face of this tariff sheet—the clause to be so enlarged by judicial interpretation, that it would be thereafter within the power of state commissions, at any time, through changes of state classifications, to alter from time to time, and without consent of the interstate carriers, interstate rates for interstate commerce, unless such interstate carrier instantly reconformed its tariff sheets to the changed classifications of the several state commissions. Indeed, taking this along with some of the other questions that have been brought to our attention in connection with these schedules, we are not prepared to say that tariff sheet No. 24 really fixes the rate on petroleum and its products at eighteen cents. The most we can say is, that the question is one upon which judges, after full discussion, might very reasonably disagree. And when to this we add that the representative of the plaintiff in error, in charge of its traffic affairs, knew that a six and a quarter cent rate—the equivalent of a six cent rate over the Alton—was the lawful published rate of the competing Chicago & Eastern Illinois Railroad, duly filed with the Interstate Commerce Commission; that in this tariff schedule No. 24 there were no oils, and nothing similar to oils even though small in quantity as freight compared with petroleum and its products, scheduled at more than ten cents; that he had been told by the Alton representative that six cents was the lawful Alton "commodity" rate; that he knew that in 1903 there were in force on the Alton road, three hundred and eighty-six commodity tariffs of the same character as the six cent tariff which he was told was the commodity tariff on petroleum and its products, and in 1904 and 1905 even a larger number of such commodity tariffs; and when we bear in mind that all that prevented the trial court from holding, as a matter of law, that a six cent rate upon petroleum and its products was a lawful commodity rate was that, technically, the filing with the commission of the application sheets upon which that proposed commodity rate appeared was not, in the trial court's opinion, the filing of a tariff within the requirements of the law; and when we put against this positive information, and these strong confirmatory circumstances, a confused mass of tariff sheets that on their face show no rate on petroleum and its products whatever, leaving it to the judicial mind to cipher out the eighteen cent rate by reference to other papers that may or may not have been properly interpreted, the error of the trial court in taking away from the plaintiff in error its right to submit to the jury the whole question of whether it had knowledge of the tariff sheet from which it is said to have accepted a concession, and therefore an intent to violate the law—whether the rate paid was not paid in the honest belief that it was the lawful rate—is an error that rises into one of solid substance.

This brings us to the second question: Whether, as a matter of law the number of offenses is the number of car loads of the property transported, irrespective of whether each car load constituted the whole, or a part only, of an actual single transaction resulting in a shipment.

The shipments upon which the indictment was based were within the period from September 1, 1903, to March 1, 1905; were carried in fourteen hundred and sixty-two car loads; and were settled for, and the charges thereon paid, upon thirty-six distinct days within that period. The proof shows, also, that in the regular course of business, whenever an order came to plaintiff in error from a buyer in the St. Louis district (the order being in gallons or barrels, not cars) the order was translated by the clerks into car loads, according to the capacity of the cars, running all the way from thirty thousand to eighty thousand pounds; that the oil was then loaded upon the cars—cars for that purpose nearly always standing in the yards; and that the cars were then turned over to the carrier, some single orders filling six or eight cars. Notwithstanding this, in the indictments, and upon sentence, each single car load was dealt with as a separate offense.

At the trial, the plaintiff in error moved, severally, that the government be required to proceed upon one count only and to elect such count; that the government be required to proceed upon one count averred to have taken place during each of the years 1903, 1904 and 1905, respectively, and to elect such count; and that the government be required to proceed upon thirty-six counts only, or upon as many counts as there were settlements and payments by the shipper to the carrier, and to elect such counts; all of which motions were overruled.

The chief argument, if we rightly comprehend the argument and can state it compactly, in favor of the proposition that under these cir·cumstances each car transported constituted a separate offense is, that each "act of transportation," whereby property in interstate or foreign commerce is transported at the prohibited rate, constitutes a distinct offense, and that each car was a separate act of transportation, as was evidenced by the issuing of a way bill to the plaintiff in error for every car.

The offense denounced in the statute, and charged in the indictment, is the accepting by plaintiff in error of a concession in respect to the transportation of property in interstate commerce, whereby such property was transported at a less rate than that named in the tariffs published and filed. The gist of the offense is the acceptance of the concession, irrespective of whether the property involved was car loads, train loads, or pounds. Has a shipper fully and finally accepted a concession when he has done nothing more than to agree with the carrier that less than the published and filed rates shall be paid for transportation of his property? Is it not necessary that the transaction be closed by actual payment of the lower rate? Take the rebate, the commonest form of the evil—the concession being only a variety. In the rebate, the shipper pays in the first instance the full rate to the carrier and afterwards receives back a part. Manifestly the offense of accepting a rebate has not been committed until the shipper has

taken back a part of the freight money, whereby his property has been transported at less than the lawful rate. Proof that he agreed to accept a return of a part of the full rate—stopping there—would not support an indictment for accepting a rebate. Such an agreement is not binding; and at any time before its complete fulfillment the shipper may repent and insist upon the carrier's keeping the whole amount. The concession differs from the rebate only in this, that in the concession the shipper, instead of paying the full rate and receiving back part, merely settles for the difference. The result is the same—the property is transported for the same net amount less than the lawful rate. And there is no basis in the statute for holding that in the case of accepting a concession the transaction is consummated, and the door of repentance is closed, at any earlier moment than in the case of accepting a rebate. So proof that a shipper has agreed to accept a concession—stopping there—whether the proof be embodied in way bills, or book entries, or formal contracts, will not support an indictment for accepting a concession, until the intended wrong becomes an accomplished fact. Of course the irrevocable may be reached and the transaction consummated in other ways than by money settlements, as by the off-setting of mutual accounts. The point is that the transaction, as a transaction, must be consummated.

The offense of accepting a concession is the "transaction" that the given rebate consummates—not the units of mere measurement of the physical thing transported—but the "transaction" whereby the shipper, for the thing shipped, no matter how great or how little its quantity, received a rate different from the established rate—the wide range between maximum and minimum punishment being doubtless thought to be a sufficient range within which to differentiate the punishment adapted to one transaction, from the punishment adapted to another.

The number of offenses in the present case should have been ascertained in accordance with these principles. The measure adopted by the trial court was wholly arbitrary—had no basis in any intention or fixed rule discoverable in the statute. And no other way of measuring the number of offenses seems to have been given a thought either by the government or the trial court.

This brings us, then, to the last question, Did the court, in the fine imposed, abuse its discretion? The defendant indicted, tried and convicted, was the Standard Oil Company, a corporation of Indiana. The capital stock of this corporation is one million dollars. There is nothing in the record, in the way of evidence, either before conviction, or after conviction and before sentence, that shows that the assets of this corporation were in excess of one million dollars. There is nothing in the record, either before conviction, or after conviction and before sentence, that shows that the defendant, before the court, had ever before been guilty of an offense of this character. It may, therefore, be safely assumed, that but for the relation of the defendant before the court to another corporation not before the court—a relation to be presently stated—the court would have measured out punishment on the basis of the facts just stated.

That under such circumstances the punishment would have been

the maximum punishment, does not seem possible; for, bearing in mind that this is not the punishment of an unlawful business, but the punishment of unlawful practices connected with a lawful business, the maximum sentence, put into execution against the defendant before the court, would wipe out, many times, and for its first offense, all the property that constitutes the defendant's lawful business.   Put into execution, this maximum sentence would add to the liabilities of defendant to its creditors, (and, according to a petition of the government on the matter of supersedeas there were current liabilities of from three to five million dollars) an additional liability of twenty-nine million, two hundred and forty thousand dollars; resulting without doubt in a condition of bankruptcy that would deduct from every creditor's share of the assets to be divided a sum running from fifty to nearly one hundred per cent. of the money that such creditors had advanced.   Is the defendant, by way of regulative punishments, to be thus punished?   Are the creditors to be thus punished?   Would a cab driver, convicted of violating the city law against excessive cab fares, be sentenced to pay a fine that would take his horse and cab, and then leave him a bankrupt many times over, unable to pay anything but the least proportion of his debts to his other creditors?   Is this case another case, simply because, instead of being an individual, the defendant is a corporation, and instead of being up for sentence under a city ordinance that was intended, not to destroy, but to regulate, the defendant was up for sentence under a national law that was intended, not to destroy, but to promote?   Indeed, that the sentence was not imposed on the basis of the facts just stated respecting the defendant before the court, but was imposed wholly because of other facts, wholly outside the record so far as this defendant is concerned, is disclosed by the reasons set out in connection with the sentence.

Briefly stated, the trial court had in mind when the sentence was fixed, not so much the Standard Oil Company of Indiana, as the Standard Oil Company of New Jersey; and intended by the imposition of this sentence, to reach and punish, not so much the Standard Oil Company of Indiana, as the Standard Oil Company of New Jersey. "The nominal defendant is the Standard Oil Company of Indiana, a million dollar corporation.  The Standard Oil Company of New Jersey, whose capital stock is one hundred million dollars, is the real defendant," says the trial court in imposing the sentence; and with this in mind "for the guidance of the court in determining the penalty to be fixed" the court says information was requested, as to what corporation held the stock of the Standard Oil Company of Indiana, what the outstanding capital stock of such "holding" company was, and what its (the holding company's) net earnings and dividends were, for the three years covered by the indictment, in order, as the court said, that it might "advisedly exercise the discretion required by the law in fixing the punishment."  And, when such information was not furnished, it was the officers of the Standard Oil Company of New Jersey who were subpœnaed before the court, and it was the net earnings and dividends, not of the Standard Oil Company of Indiana, but of the Standard Oil Company of New Jersey, that was obtained, for the three years covered by the indictment—proceedings and a purpose

that have no meaning unless, in the mind of the court, one of the parties to the punishment was to be the Standard Oil Company of New Jersey.

That this was the view and purpose of the trial court is again disclosed in the reason given why the fine was fixed at the amount stated, viz.: "that for the law to take from one of its corporate creatures, as a penalty for the commission of a dividend producing crime, less than one-third of its net revenues accrued during the period of violation, falls far short of the imposition of an excessive fine"—the "dividend producing crime" in the mind of the court obviously being the crime, not of the Standard Oil Company of Indiana (it had not been brought out what were that company's net revenues)—but of the Standard Oil Company of New Jersey, whose net revenues were said by the court, in this connection, to be "approximately forty per cent." upon the "approximately one hundred million dollars" of its capitalization.

And again, in fixing the penalty, the trial court said "in this connection it may be observed that the figures exhibiting the net earnings of the Standard Oil Company of New Jersey during the period covered by this indictment are exceedingly instructive, because of the peculiarly intimate relation between the character of the crime, and the revenues of the offender"—a remark wholly without meaning unless the court had in mind the revenues of the Standard Oil Company of New Jersey, for, as already stated, no revenues of the Standard Oil Company of Indiana were in the record; and a remark also wholly without meaning, unless the court had in mind that the offense for which he was fixing the punishment was not the company's first or "virgin" offense; for all the revenues derived from the transactions involved in the trial were—so far as the record enables us to figure them out—an infinitesimal amount merely of the amount of revenues upon which that statement was based. Indeed, that it was the Standard Oil Company of New Jersey that the trial court was reaching out for, counsel for the government do not dispute, but seek rather to justify by the statement that:

"The effect of these violations of the law was to enhance the earnings of the Standard Oil Company of Indiana, and every dollar of the increased earnings of that company, went into the treasury of the Standard Oil Company of New Jersey. It was the Standard Oil Company of New Jersey, therefore, who was the real beneficiary of the unlawful acts of the plaintiff in error."

Now can a sentence such as the trial court imposed, based upon reasoning such as the trial court gave, be a sound sentence? Can a court without abuse of judicial discretion, wipe out all of the property of the defendant before the court, and all the assets to which its creditors look, in an effort to reach and punish a party that is not before the court—a party that has not been convicted, has not been tried, has not been indicted even? True it is, that if one corporation uses another corporation to violate law, just as if one individual uses another individual to violate law, such offender ought not, though masked, to go unpunished. And there are ways, as old as the law itself. to reach and punish him. But can the individual who is merely "said" to have procured the crime to be committed be deprived of a hear-

ing——be condemned to punishment without being tried, convicted, or indicted even?  Can an individual merely "said" to be behind the party convicted, be reached for punishment, not by indictment, trial, and conviction in due process of law, but by supplemental proceedings before the judge, somewhat in the nature of civil proceedings in aid of execution?  Can an American judge, without an abuse of judicial discretion, condemn any one, individual or corporation, who has not, in his own person, first been duly indicted, duly tried, and duly convicted?

That, to our mind, is strange doctrine in Anglo-Saxon jurisprudence. No monarch, no parliament, no tribunal of Western Europe, for centuries, has pretended to have the right to punish except after due trial under all the forms of the law.  Can that rightfully be done here, on no other basis than the judge's personal belief that the party marked by him for punishment deserves punishment?  If so it is because the man who happens to be the judge is above the law.

Counsel for the government say, in concluding their brief, that the Elkins Act was passed because the peace of society and the welfare of the people demanded it; that railroad inequality means business ruin to all except those powerful enough to make themselves the beneficiaries of the discriminations; means the wiping out of an industry, of a town, of a city, at the command of an officer of a private corporation; that railroad inequality is the basis of monopoly and the wrongful concentration of wealth; that no law of more vital importance was ever passed by congress; and that those guilty of violating it, are guilty of a serious crime against the principles of industrial freedom and equality.

Every sentence of that arraignment is true.  That this court recognizes the importance of the enforcement of that act is shown in its affirmance of penalties that under other circumstances would be regarded as very severe.  But the Interstate Commerce Act, important as that law is, is not the only law under which we live.  We live under a guaranty that reaches back to the beginnings of our law, and is securely planted in every constitution of civilized government, that no one shall be punished until he has been heard; and above this fundamental guaranty there can be set no higher prerogative; for let it once come to pass that under the stress of enforcing commercial equality, any power in the government may override the fundamental human right of being judged only after having been duly tried——a right just as essential to men in the associated relationship of the corporation, as to men in the relationship of copartners, or to men individually——there will remain no commerce worth the name to safeguard.  The beginning of commerce is constitutional government, and the foundation of constitutional government is the faith that every guaranty of our institutions, no matter what the provocation, will be sacredly observed.

The judgment of the District Court is reversed and the case remanded with instructions to grant a new trial, and proceed further in accordance with this opinion.

BAKER, Circuit Judge (concurring).  The judgment of reversal seems to me inevitable; and I agree that each of the three stated

grounds is well taken. I purpose merely to state some considerations which I have deemed particularly controlling with respect to the first and third questions.

The most important question, because involved in every prosecution for rebating, is the proper construction of the statute. Carriers are forbidden "to offer, grant or give," and shippers "to solicit, accept or receive any rebate, concession or discrimination in respect of the transportation of any property in interstate or foreign commerce * . * * whereby any such property shall, by any device whatever, be transported at a less rate than that named in the tariff published and filed." Each count of the indictment alleged that the defendant knowingly accepted and received a concession. The court charged that "it was the duty of the defendant to diligently endeavor in good faith to get from the Chicago & Alton Company the lawful rate by applying to the Alton Company at one of its freight or traffic offices or depots," and that "the defendant must be held to have known that which this diligent endeavor would have enabled it to find out." The court refused to charge that the defendant could not properly be convicted unless it "either actually knew that it was accepting and receiving a concession or willfully and intentionally ignored facts and circumstances known to it which would have led to such knowledge." Thus a line was drawn between the negligent (unintentional) failure to ascertain the rate and the willful (intentional) disregard of knowledge of the rate or of facts which would lead to such knowledge. Did Congress denounce as an indictable offense a shipper's negligence, namely, his unintentional failure to learn the published and filed rate?

The purpose of all canons of interpretation is to discover and effectuate the will of the lawmakers; and the primary rule, to which all others are subsidiary, is to read the text according to the ordinary rules of grammar and composition, and to take the words in their usual meanings. For the carrier, "to offer" or the shipper "to solicit" involves the knowing and consenting mind. No common, no lexical, no technical definition to the contrary can be found. To say "to offer knowingly," "to solicit knowingly," is the veriest tautology. Likewise "to grant" or "to accept" requires the conscious and understanding act of the intellect and will. If one does not know what he is about, his alleged grant is no grant. If one does not know the scope and nature of his act, his alleged acceptance is no acceptance. Does any ambiguity arise because the words "to give" and "to receive" are also used? "To offer" and "to solicit" characterize the inchoate act. The completed act that is condemned is for the carrier "to grant or give" and the shipper "to accept or receive." Ordinary and accepted meanings of "give" and "receive" are synonymous with those of "grant" and "accept." As all those words appear in the same phrase of the same sentence, the principle of ejusdem generis forbids their being taken to indicate acts of antagonistic quality. Further, the emphasis herein given to the verbs is doubled when regard is extended to the nouns, "rebate, concession, or discrimination." Each of these nouns in and of itself implies a comparison with, a measurement by, and a departure from, a determined standard. Congress did not say (but, if it had,

an argument might well be made that negligence in not learning published rates was to constitute a crime):

"The shipper whose property shall be transported in interstate or foreign commerce at a less rate than that named in the published and filed tariffs shall be subject to a fine."

But Congress only said:

"The shipper who shall solicit, accept or receive a rebate, concession or discrimination in respect of the transportation of his property in interstate or foreign commerce shall be subject to a fine."

But even if by lexicon and grammar "to receive a concession" could fairly be given the meaning "to come into the possession of a concession without knowledge or consent," an auxiliary canon of construction would prevent that choice of meanings. That canon is that unless no other way is open a penal act will not be sustained and administered on the theory that it was "cunningly and darkly penned," so as to entrap a merely negligent citizen within the meshes of a criminal prosecution. To couple in the same breath and under the same punishment such vitally different acts as the willful violation of the legally established equality between shippers and the unintentional failure to ascertain a published rate would constitute a trap unparalleled, so far as I have learned, in the annals of legislation.

In further pursuit of the inquiry whether Congress intended to penalize a shipper's unintentional failure to ascertain a published rate, it is permissible to examine and see how Congress has treated the subject of negligence in other parts of the same act. In the very same section the carrier's failure to file and publish rates or to observe them strictly until duly changed is made punishable by the same fine as rebating. "Failure" covers both intentional and unintentional non-performance. So, in the interest of precision, it became necessary to define the quality of the action. And here, at the only place where there was a definite call to say whether negligence should be punishable, Congress explicitly said "No."

Another ancillary canon is to examine the history of the times immediately preceding the passage of a statute in order to learn the evil it was designed to remedy.

In the admirable and exhaustive "Report of the Senate Select Committee on Interstate Commerce," January 18, 1886 (Senate Report 46, 1st Session, 49th Congress), the following appears on pages 188–190.

"Differences in rates between different commodities of a similar character are often unavoidable and justifiable, as has been shown, but no excuse can be offered for any discrimination in the charges made by a common carrier as between persons similarly situated for whom a like service is performed under similar circumstances. This is the most flagrant and reprehensible form of arbitrary discrimination. Individual favoritism is the greatest evil chargeable against the management of the transportation system of the United States. The evidence before the committee shows that it has come to be considered by railroad officials as an indispensable feature of the system upon which their business is now carried on, and reveals its existence to an extent that imperatively demands additional legislation to protect the people in their common-law rights and to insure them the equal enjoyment of the advantages of transportation.

"One reference to the testimony must suffice to illustrate the universality of individual favoritism, the reasons which influence the railroads in favoring one shipper to the ruin of another, and the injustice of the system. Mr. C. M. Wicker, of Chicago, a former railroad official of many years' experience, was asked if he knew anything of discriminations upon the part of transportation companies as between individuals or localities, and testified as follows:

"Mr. Wicker: 'Yes; I do. And this discrimination, by reason of rebates, is a part of the present railroad system. I do not believe the present railway system could be conducted without it. Roads coming into the field today and undertaking to do business on a legitimate basis of billing the property at the agreed rates would simply result in getting no business in a short time.'

"Senator Harris: 'Then, regardless of the popularly understood schedule rates, practically it is a matter of underbidding for business by way of rebates?'

"Mr. Wicker: 'Yes, sir; worse than that. It is individual favoritism; the building up of one party to the detriment of the other. I will illustrate. I have been doing it for years myself, and had to do it.'

"Senator Harris: 'Doing it for yourself in your position?'

"Mr. Wicker: 'I am speaking now of when I was a railroad man. Here is quite a grain point in Iowa, where there are five or six elevators. As a railroad man, I would try and hold all those dealers on a "level keel," and give them all the same tariff rate. But suppose there was a road five or six or eight miles across the country, and those dealers should begin to drop in on me every day or two, and tell me that that road across the country was reaching within a mile or two of our station and drawing to itself all the grain. You might say that it would be the just and right thing to do to give all the five or six dealers at this station a special rate to meet that competition through the country. But, as a railroad man, I can accomplish the purpose better by picking out one good, smart, live man, and, giving him a concession of three or four cents a hundred, let him go there and scoop the business. I would get the tonnage; and that is what I want. But if I give it to the five, it is known in a very short time. * * * When you take in these people at the station on a private rebate, you might as well make it public and lose what you intend to accomplish. You can take hold of one man, and build him up at the expense of others, and the railroad will get the tonnage.'

"Senator Harris: 'The effect is to build that one man up and destroy the others?'

"Mr. Wicker: 'Yes, sir; but it accomplishes the purposes of the road better than to build up the six.'

"Senator Harris: 'And the road, in seeking its own self-preservation, has resorted to that method of concentrating the business into the hands of one or of a few to the destruction of the many?'

"Mr. Wicker: 'Yes, sir; and that is a part and parcel of the system.'

"Senator Harris: 'Is that system continued up to this time?'

"Mr. Wicker: 'Yes, sir.'

*      *      *      *      *      *      *      *      *      *

"The practice prevails so generally that it has come to be understood among business men that the published tariffs are made for the smaller shippers and those unsophisticated enough to pay the established rates; that those who can control the largest amounts of business will be allowed the lowest rates; that those who, even without this advantage, can get on 'the inside,' through the friendship of the officials or by any other means, can at least secure valuable concessions; and that the most advantageous rates are to be obtained only through personal influence or favoritism or by persistent 'bulldozing.'

"It is in evidence that this state of affairs is far from satisfactory, even to those specially favored, who can never be certain that their competitors do not, or at any time may not, receive even better terms than themselves. Not a few large shippers, who admitted that they were receiving favorable concessions, testified that they would gladly surrender the special advantages they enjoyed if only the rates could be made public and alike to all.

"This suggests the remedy that should be applied, and the question of securing publicity of rates will be considered hereafter. The secrecy which at-

tends these transactions is the only evidence that is needed of their injustice. The uncertainty as to the rates actually charged which the system of personal favoritism occasions is demoralizing to all legitimate business, and is calculated to encourage only that which is purely speculative.

"The methods by means of which personal favoritism may be indulged in are limited in variety only by the ingenuity and inventive capacity of the railroad officials. Its most common manifestation is in the form of special contracts, special rates, rebates, underbilling, and other secret devices for evading the schedule rates; but it is possible to accomplish the same purpose in so many different ways, when desired, that the absolute prevention of the practice will be attended with no little difficulty."

A book that was cited in the debates was Hudson's "The Railways and the Republic," published in 1886. This work (particularly the chapters on "Ten Years of Discrimination," "The History of a Commercial Crime," "The Law and the Railways," and "The Discussion of Remedies") indicates quite as clearly as does the Senate report that the evil to be remedied was "personal favoritism," brought about by secret understandings and arrangements between railroads and favored shippers, and that the remedy for the evil was to let the light of publicity into the matter of rates, to prohibit all sorts of secret understandings and arrangements under pain of criminal punishment, and to provide a governmental agency to represent the aggrieved shipping public as against the oppressive railroads and their commercial favorites.

After several years of operation it was found that the Cullom act needed amending, not because of any failure to diagnose the evil accurately and fully, nor because of any misapprehension of the general course of treatment needed, but because it was considered desirable to test a represcription of the punitive remedies. All this is proven, I find, by the very clear report of the House Committee on Interstate and Foreign Commerce concerning the pending Elkins bill, February 12, 1903 (House Report 3765, 2d Session, 57th Congress). Under the Cullom act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]) "personal favoritism" was declared unlawful; and it was thought that the practice could be stopped by prescribing fine and imprisonment for any officer or agent of a carrier who entered into a secret arrangement with a shipper. But it was found virtually "impossible to obtain proof of the granting of a rebate by the officer of a railroad to some favored shipper unless the officer himself gives the evidence, in which case he is free from prosecution." So it was proposed to extend the penalty to the corporation carrier itself. Again, the Cullom act made the treatment of other shippers the test of discrimination. It was determined to make the published rates the standard of measurement, and to extend the punishment as well to shippers who solicited or accepted any departure from the published rates. This House report quotes the testimony of members of the Interstate Commerce Commission as exhibiting fully and accurately the then existing conditions that were to be met by the Elkins bill. I set forth a few expressions as illustrative:

"* * * Rebating and rate cutting and all those different devices by which one shipper in a given locality gets better rates than his business rivals. * * * A railroad officer makes a secret compact with a shipper which gives him a lower rate than the public are required to pay. * * * I want

two things: I want the corporation carrier made liable, and I want the ship-per made liable when he accepts a preference or secret rate whether there is discrimination or not. * * * I want to repeat that there are two changes in the law relating to the enforcement of criminal remedies which are im-portant, against which I venture to say no one will come here and interpose opposition. They are that the corporation carrier shall be made liable, and not simply its agent and representative, and that the shipper shall be made liable who knowingly accepts a lower rate than that provided by the publish-ed tariff without being obliged to show that he thereby secured a discrimina-tion in favor of himself and against his business rivals."

To my mind this history furnishes clear and affirmative proof that the evil to be remedied in 1887 and in 1903 as well was nothing less than conscious and intended departures from the published rates. The same conclusion is reached by considering certain historical data nega-tively. While the views and reasons of an individual Senator or Rep-resentative expressed in debate cannot be taken as the views and reasons of Congress, yet what fails to appear in the debates may be considered as an historical fact tending negatively to prove what the scope of the evil was that needed remedying. An extended search through the Congressional Record covering the period in 1884 and 1885 when the Reagan bill was pending, in 1886 and 1887 when the bills that resulted in the Cullom act were under consideration, and in 1903 when the Elkins bill was up, has failed to produce a word or hint that a single Senator or Representative during all those years was aware that one of the moving causes of the quarter century's agitation preceding the Elkins act was the negligence of shippers in their un-intentional failure to learn that the rates tendered them by carriers were not the true rates.

With respect to the amount of the fine I agree that errors of law were committed. I do not mean that the mere size of the fine involved error. The questions, according to my view, would be the same had there been but one count in the indictment and an assessment thereon of $20,000. Nor do I mean that the discretion of this court may be substituted for the discretion of the trial court. The case is here upon writ of error, and it is incumbent upon plaintiff in error to prove affirmatively by the record that errors of law entered into the judg-ment.

The bill of exceptions (the part under consideration is published in 155 Fed. 316–320) shows that the maximum of $20,000 was reached by acting upon certain matters as aggravations of the offense.

One of these was the finding that the defendant company against which judgment was about to be pronounced was merely a tool of the real offender. Such a circumstance may lawfully be considered in mitigation. To use it in aggravation violates, in my opinion, that prin-ciple of the law which forbids the punishment of one for another's crime. The real offender should be proceeded against directly.

Another error of law occurred in denying the defendant company the benefit of the legal presumption that it had not, previously to the times laid in the indictment, violated the interstate commerce law. The record discloses that the court offered to hear in mitigation of punish-ment "any evidence that might be submitted by the defendant as tend-ing to show that neither it nor the Standard Oil Company of New

Jersey had ever violated the interstate commerce law before"; that the defendant declined to "attempt to show that it has been innocent of any wrongdoing in connection with matters outside of this record, when there is nothing before this court charging it with such wrongdoing," and insisted that the court "must certainly presume the complete innocence of this defendant of any prior violations of the interstate commerce law, and fix its penalty, if any, solely upon the record in this case"; and that the court concluded that:

"Of course, on the trial of a defendant for a specific offense, this presumption is indulged in favor of that defendant as to that offense; but where, as in this case, the crime charged was the acceptance of a preferential railroad rate, in violation of a law that had been on the books for nearly 20 years; where during a period of 18 months, 1,900 car loads of property were shipped at an unlawful rate, which amounted to but one-third of the rate available to the general shipping public; where the convicted defendant's transportation affairs were in the charge of an expert traffic official of at least ordinary intelligence and many years' railroad traffic experience, and who was a frequent visitor at the general freight office of the railway company; where the unlawful rate was shown only by a paper appearing on its face to be a special billing order, and which directed that settlement for services rendered at the rate which it authorized should be made through the railway company's auditor's office instead of at the railway station or freight office, as is done by the general shipping public; and where the defendant when brought to trial persistently maintains that the Constitution of the United States guarantees to it the right to make a private contract for a railroad rate—this court is obliged to confess that he is unable to indulge the presumption that in this case the defendant was convicted of its virgin offense."

Thus, it seems to me, the court virtually found the defendant guilty of prior offenses on the assumption that the state of affairs shown to have existed during the 18 months covered by the indictment extended backwardly from the earliest date named in the indictment. As to the lawfulness of considering prior offenses in aggravation and as to the methods of proving prior offenses, the trial court cited 1 Bishop's New Crim. Law, §§ 948, 950. If Bishop's latitude as to ex parte affidavits and hearsay evidence were the established law, error in this case would nevertheless remain, for not even such method nor such evidence was back of the denial of the presumption of innocence.

## On Rehearing.

PER CURIAM. The petition for rehearing questions the correctness of the text of that portion of the opinion that relates to the trial judge's statement, in passing sentence, that he was "unable to indulge the presumption that in this case the defendant was convicted of its virgin offense"—the point of the petition being, that in the use of the word "defendant" in connection with "virgin offense," the trial court referred to the Standard Oil Company of Indiana, and not to the Standard Oil Company of New Jersey. The trial court, in passing sentence, expressly stated that the Standard Oil Company of Indiana was but the nominal defendant, the Standard Oil Company of New Jersey being the real defendant; and every word, almost, of the trial court, in arriving at its conclusion respecting the sentence, related to the Standard Oil Company of New Jersey, and not to the Standard Oil Company of Indiana, including the statement that the rev-

enues of the "offender," and the character of the crime, showed that they had a peculiar relation to each other—the revenues referred to obviously being the revenues of the Standard Oil Company of New Jersey—40 per cent. on $100,000,000—no revenues of the Standard Oil Company of Indiana being in the record at all. And counsel for the government plant their justification of the fine upon the showing of the revenues, not of the Standard Oil Company of Indiana, but of the Standard Oil Company of New Jersey. But as a suggestion that that line in the text of the opinion be changed, the suggestion will be accepted, and the opinion so amplified that while the language used to express the point is changed, the substance of the point involved will be more clearly brought out.

The petition for rehearing also questions the correctness of the text of that portion of the opinion in which, dealing with the question whether a shipper is guilty of accepting a concession, even though it is shown that the shipper, at the time of accepting such concession, did not know what the lawfully published rate actually was, the view taken by the trial court is said to be "a view of the law that is embodied in the charge, and carried out in the rulings 'excluding' certain proffered testimony, including that of one Edward Bogardus"— the point of the complaint being that the testimony of Bogardus, as to whether he knew or did not know of an 18 cent rate over the Alton road, was not "excluded."

Now as a matter of what physically went into the record, Bogardus' testimony was admitted, and went to the jury on the issue adopted by the court whether he had made "diligent endeavor" to ascertain the rate—an issue wholly different from the one upon which it was offered, viz., whether or not defendant had knowledge of what the lawfully established rate was. On the latter issue, the testimony of Bogardus was as effectually excluded by the charge to the jury as if it had physically been expunged from the record.

Courts have the right to expect that counsel accustomed to practice in the courts of review, not only know the meaning of legal terms constantly in use in discussions and opinions of these courts, but will not misuse such terms to spread misinformation respecting a judgment that, in the nature of the case, is bound to attract wide public attention—a remark the germaneness of which the bar of the country will perceive when we say that all that has to be done to obviate the objection made, is to insert a clause so that the portion of the opinion objected to will read "a view of the law that is embodied in the charge, and carried out in the rulings excluding, *as a result of the charge on that point,* the proffered testimony of one Edward Bogardus"—the italicized portion being the only words inserted.

Petition is overruled.