**DEWEY PORTLAND CEMENT CO. v. CROOKS, Collector of Internal Revenue.**

No. 7784.

District Court, W. D. Missouri, W. D.

May 29, 1930.

Walter J. Carrico, of Tulsa, Okl., and Hale Houts, of Kansas City, Mo., for plaintiff.

William L. Vandeventer, U. S. Atty., and Chet A. Keyes, Asst. U. S. Atty., both of Kansas City, Mo., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Lester L. Gibson, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for defendant.

OTIS, District Judge.

This is an action to recover alleged excess taxes in the sum of $18,755.86, paid for the year 1918. Recovery of this amount is sought under and by virtue of the provisions of section 234(a) (14) of the Revenue Act of 1918 (40 Stat. 1079), which, so far as is here pertinent, reads as follows:

"At the time of filing return for the taxable year 1918 a taxpayer may file a claim in abatement based on the fact that he has sustained a substantial loss (whether or not actually realized by sale or other disposition) resulting from any material reduction (not due to temporary fluctuation) of the value of the inventory for such taxable year, or from the actual payment after the close of such taxable year of rebates in pursuance of contracts entered into during such year upon sales made during such year. In such case payment of the amount of the tax covered by such claim shall not be required until the claim is decided. * * * If no such claim is filed, but it is shown to the satisfaction of the Commissioner that during the taxable year 1919 the taxpayer has sustained a substantial loss of the character above described then the amount of such loss shall be deducted from the net income for the taxable year 1918 and the taxes imposed by this title and by Title III for such year shall be redetermined accordingly. Any amount found to be due to the taxpayer upon the basis of such redetermination shall be credited or refunded to the taxpayer in accordance with the provisions of section 252."

More particularly, plaintiff's claim is based upon that part of the above-quoted provision of the Revenue Act of 1918 which provides for a refund where the taxpayer has "sustained a substantial loss * * * resulting * * * from the actual payment after the close of such taxable year of rebates in pursuance of contracts entered into during such year upon sales made during such year." The case was tried to the court, a jury having been waived by written stipulation. From the agreed statement of facts offered in evidence I make the following

### Findings of Fact.

I. The plaintiff is a corporation organized in 1906, under the laws of the state of West Virginia, and was during all of the time mentioned in the petition, and now is, duly licensed to transact business in the state of Missouri. The plaintiff's office and principal place of business is at Kansas City in

said state. Plaintiff was and is engaged in the manufacture and sale of Portland cement.

II. The plaintiff has at all times made its federal income tax returns on the calendar year basis and has kept its books and records on an accrual basis.

III. On or about the 15th day of April, 1919, the plaintiff filed with the collector of internal revenue at Kansas City, Mo., its corporation income and profits tax return for the year 1918, on Form 1120, as required by the Revenue Act of 1918, and paid the tax shown due thereon in the amount of $7,372.09.

IV. On the September, 1924, assessment list, the Commissioner of Internal Revenue made an additional assessment against the plaintiff for the year 1918 in the amount of $26,780.56. The additional assessment was arrived at by increasing plaintiff's net income in the amount of $78,026.55, which was shown on its books as "sack redemption fund" and not reported as income in its said return for the year 1918. The additional assessment was paid to the collector of internal revenue at Kansas City, Mo., in two payments, as follows: $23,212.50 on October 22, 1924, and $3,567.97 on February 20, 1925.

V. On October 3, 1927, the plaintiff filed a claim for refund of the additional assessment in the amount of $26,780.56. On February 29, 1928, the plaintiff's claim for refund was rejected.

VI. On December 18, 1923, the taxpayer and the Commissioner of Internal Revenue entered into a waiver agreement extending the period for determination, assessment, and collection of any tax due for the year 1918, for a period of one year from the date thereof.

VII. The plaintiff during the year 1918 and for many years prior thereto delivered its product, Portland cement, packed in cloth sacks, bearing the name and trade-mark of plaintiff stamped thereon in large letters, which was the general custom of the cement industry in delivering its product.

VIII. The plaintiff for many years prior to 1918 and during the period from January 1, 1918, to September 16, 1918, sold its product under contracts containing a clause reading as follows:

"Sacks. The price named includes the sacks in which the cement is to be shipped. Cloth sacks of Dewey Brand delivered hereunder will be repurchased subject to the seller's inspection and count, at ten cents each if returned promptly in serviceable condition at Dewey, Oklahoma. Sacks that have been wet or are worthless will not be repurchased."

IX. The plaintiff beginning with September 16, 1918, and throughout the remainder of 1918, sold its product under contracts containing the aforesaid clause, but with the amount stated therein changed from 10 cents to 25 cents.

X. Pursuant to the aforesaid agreement, the plaintiff repurchased from customers at least 90 per cent. of the total sacks sold to them.

XI. The sacks sold during the period from September 16 to December 31, 1918, were stamped in such a manner as to clearly identify them as sacks which the plaintiff had agreed to repurchase at 25 cents. Sacks presented by others than customers for repurchase were not bought at the price agreed upon in plaintiff's contract with customers.

XII. Prior to September 16, 1918, the plaintiff recorded on its books the sales of cement delivered in cloth sacks by debiting the customer's account with the selling price of the cement, plus 10 cents for each sack and crediting the selling price of the cement to "cement sales" and ten cents to "sack inventory." When the sacks were repurchased, "sack inventory" was debited 10 cents for each sack and a corresponding credit made to the customer's account.

XIII. Beginning with September 16, 1918, entries to reflect transactions involving cloth sacks were placed upon plaintiff's books by debiting customer's account with the selling price of cement, plus 25 cents for each sack and crediting selling price of the cement to "cement sales" and 25 cents to "sack redemption fund." An additional entry was made debiting "sacks in hands of customers" 10 cents and crediting a like amount to "sack inventory." When sacks were repurchased, "sack redemption fund" was debited and the customer's account credited with 25 cents. An additional entry was made whereby "sack inventory" was debited 10 cents for each sack repurchased and a corresponding credit made to "sacks in the hands of customers."

XIV. During the period from September 16 to December 31, 1918, the plaintiff delivered to its customers 606,453 sacks of Portland cement, packed in cloth sacks, and the charge therefor included 25 cents for each sack. During the said period there were

returned to the plaintiff 86,276 sacks, leaving a balance of 520,177 sacks in the hands of the customers; the total amount charged for said sacks being $130,044.25. Of this amount $52,017.70 was actual cost to the plaintiff, leaving a balance of $78,026.55, which the Commissioner of Internal Revenue added to plaintiff's return as taxable income.

XV. During the year 1919, the plaintiff repurchased 392,052 sacks of the said 520,-177 outstanding and paid to its customers the sum of $98,013.

XVI. The sum of $98,013 is $58,807.80 in excess of the original cost to plaintiff of said 520,177 sacks. New sacks of the same type as the sacks repurchased from customers would have cost approximately 20 cents each if purchased from the manufacturers during the period from September 16 to December 31, 1918. The sacks repurchased from customers during 1919 were from one to five years old. The average life of a sack is six years.

### Memorandum Opinion.

Of the possible questions in this case there is one only that requires consideration. That question is this: Were the payments made by the plaintiff to its customers in the repurchase of sacks sold to them in 1918 under the contracts it had with them rebates within the meaning of section 234(a) (14)?

The term "rebates," as used in section 234 (a) (14), requires definition. Various definitions may be found in the works of general and legal lexicographers. Webster's International Dictionary defines a "rebate" as "a deduction; abatement; remission or payment back; to remove a portion of (a charge)." It is defined in Bouvier's Law Dictionary, vol. 3, p. 2819, as "an allowance by way of discount or drawback." In connection with federal statutes forbidding carriers to grant rebates, the word has been defined as implying "a comparison with, a measurement by, and a departure from, a determined standard." Standard Oil Co. of Indiana v. United States (C. C. A.) 164 F. 376, 390.

From these general definitions it appears that it is essential to the idea of a rebate that upon a sale of goods or services something be returned to the purchaser out of the purchase price for the purpose of accomplishing a reduction in the purchase price. There is every reason to believe that this general definition is the one intended by the Congress for the word "rebates" as used

in section 234 (a) (14). That is clearly indicated by the legislative history of the section.

The section was adopted in contemplation of extraordinary conditions obtaining in 1918 when it was expected, by reason of the termination of the World War, a great reduction in values would ensue. It was intended to permit taxpayers to claim losses by reason of these great reductions in values, both in connection with merchandise on hand and in connection with merchandise which had been sold. As to the latter class of merchandise where purchasers thereof, contemplating the probable reduction in values, exacted from the seller contracts providing for rebates in the event of a falling market and because of the probable falling market, it was thought just to provide that such rebates so paid should be allowed as losses. That that was the intention of the Congress appears from the declaration made by Senator Simmons, Chairman of the Finance Committee, in advocating the adoption of the measure. He said (Congressional Record, vol. 57, part 3, p. 3133):

"I refer to the amendment or amendments relating to shrinkage in inventories and net losses. * * * Market values are falling and this decline will undoubtedly proceed at a constantly accelerating rate. Under such circumstances the allowance for falling inventories, as amended by the conferees, will afford the greatest relief from all heavy taxes which the bill imposes.

"In general terms, where during the year 1919, by reason of a decline in values, the inventories upon which the incomes for the year 1918 were based have shrunk so as to make it apparent that the tax which would be paid in 1919, based upon these high inventories, would be based upon values that no longer exist, values that have disappeared, which will never be realized, the bill permits a reduction to the extent of the decline in the inventory values and provides that the tax for the preceding year shall be redetermined and paid upon the new basis of value, instead of upon the original inventory basis."

While the language quoted from the statement of Senator Simmons is particularly applicable to the first part of section 234 (a) (14), obviously it involves also an explanation of the part of that section with which we are here immediately concerned.

The Circuit Court of Appeals for the Eighth Circuit similarly has explained the general purpose of this section. Glover Co. v. Bladine, Collector of Internal Revenue, 34

254

F.(2d) 605, 607. See also Henningsen Produce Co. v. Commissioner of Internal Revenue (App. D. C.) 37 F.(2d) 821, 822.

Having in mind the meaning of the word "rebates" as used in this section, as that meaning is made clear both from the general definitions of the word and from the light thrown upon it by the legislative history and judicial construction of the section, it cannot be said that what the plaintiff did constituted payment of rebates to its customers. It sold sacks to its customers for 25 cents each. It agreed to purchase them back at the same price, if the customers desired to resell them to the plaintiff. It did repurchase sacks at that price. There is here none of the characteristics of rebates. Especially is there absent the essential element of price reduction by means of repayment of a part of the price paid. Moreover, a true rebate does not include the return of the article purchased, but assumes its retention by the purchaser. Furthermore, none of the reasons on account of which section 234 was adopted apply here. The agreement to repurchase was not at all influenced or brought about by any change in market conditions which might have subjected purchasers to loss on account of a falling market.

Since the payments by way of repurchase of its sacks theretofore sold to its customers were not rebates in any sense, plaintiff can have no relief under the section of the statutes relied on by it here.

### Conclusion of Law.

Upon the facts found plaintiff is not entitled to recover. It did not sustain any loss in 1918 by reason of payments of rebates under contracts entered into in connection with sales made in that year. Payments made by it in repurchasing sacks sold to its customers were not rebates.

Judgment should be for defendant. A decree may be prepared accordingly and submitted for approval and entry. An exception is allowed to the conclusion of law hereinbefore announced.